

23

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas

NOV 14 2001

| | | |
|---|---|---|
| DEBBIE KULAW, Individually and as | § | C.A. No. B-01-181 |
| Personal Representative of the Heirs | § | |
| and Estate of LeVaughn Darnold | § | |
| Plaintiffs | § | |
| | § | |
| | § | |
| v. | § | |
| | § | |
| ABLE SUPPLY CO., et al, | § | |
| Defendants. | § | |

| | | |
|---|---|---|
| IN RE: | § | Case No. 01-10578 |
| FEDERAL-MOGUL GLOBAL, INC. | § | Chapter 11 |
| Debtor | § | (Pending in the United States |
| | § | Bankruptcy Court for the |
| | § | District of Delaware) |

PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITIES

Plaintiffs file this Notice of Supplemental Authority in support of their motions

for remand and for severance, and would respectfully show as follows:

I.      JUDGE JACK'S OPINION IN IDENTICAL CASES

Plaintiffs respectfully call to the Court's attention the opinion of Judge Jack in

identical cases removed to the Corpus Christi Division of the Southern District, a copy of

which is attached as exhibit A. In Arnold v. ACandS, Inc. , No. C-01478, Garlock had

also removed Waters & Kraus asbestos cases to federal court on the basis of the Federal

Mogul bankruptcy, and had moved for an emergency transfer to the United States District

1

Court for the District of Delaware.[1]  As in the present case, plaintiffs moved for remand and/or abstention, sought a severance of the claims against the debtor, and dismissed all of their claims against the debtor entities with prejudice.  Judge Jack issued her ruling on November 9.

The court first found that the contribution claims by Garlock against the debtors "arguably" came within "related to" jurisdiction.  After noting plaintiffs' dismissal of all claims against the debtor with prejudice, Judge Jack found the remaining Garlock contribution claims "at best, tangentially and speculatively 'related to' the bankruptcy." Nonetheless, under the broad standard for "related to" jurisdiction, such claims sufficed:

> The only possible claim at issue which might be "related to" the Debtor's bankruptcy is Garlock's cross-action against "all co-defendants" for indemnification and/or contribution.  In fact, at the hearing held on October 30, 2001, Garlock conceded that, after plaintiffs' dismissal with prejudice of the debtor, the only remaining claim relevant to the removal is Garlock's cross-claim against the debtor for contribution.  Arguably, claims such as the instant claim for contribution are not even ripe for adjudication. See, e.g., Pacor, 743 F.2d at 995 (discussing indemnification claims in the context of "related to" jurisdiction). Though this Court declines to find that defendant lacks standing to remove, it should be noted that Garlock's contribution claims are, at best, tangentially and speculatively "related to" the bankruptcy.  Compare, for example, Pacor, 743 F.2d at 995) ("indemnity action not "related to" the bankruptcy); Matter of Walker, 51 F.3d 562 (5th Cir. 1995) with In re Dow Corning, 86 F.3d 482, 486 (6th Cir. 1996); In re Harrah's Entertainment, Inc. Securities Litigation, 1996 WL 684463 (E.D. La., Nov. 26, 1996).  Assuming, arguendo, that Garlock's claim for contribution is still viable after plaintiffs' dismissal with prejudice of the debtor, the Court finds removal proper based on section 1452(a), and Section 1334, at least for those claims brought against the debtor.  In the end, it is clear that "related to" jurisdiction is treated very broadly under the Pacor test adopted by the Fifth Circuit in Wood.  As such, the Court finds that the contribution claims are arguably "related to" the bankruptcy, as they could conceivably have an effect on the estate being administered in bankruptcy.

Order at 8-9 (footnote omitted).

---

[1] Nine separate cases were removed to the Corpus Christi Division, and all were consolidated before Judge Jack.  Her order in the Arnold case is similar to all the others.

The court next granted plaintiffs' motion for severance. Concluding that since plaintiffs had given up their claims against the debtor, and since "plaintiffs' state court personal injury action has already proceeded so far in the state court system, severance of all claims against the debtor appears warranted[,]" the court severed the cross-claims by Garlock (and by any other defendant) against the debtors into a separate cause number, and then transferred those claims to the District of Delaware. Order at 10-11 and n. 7.

Judge Jack also rejected straightforwardly Garlock's insistence that transfer to Delaware occur before remand is decided:

> "Though such a course of action would certainly yield the preferred result *for Garlock*, the Court declines to ignore settled principles regarding the limits of the jurisdictional authority of federal courts by simply skipping over an analysis of the propriety of removal in this case and becoming a legal way-station under Section 157(b)(5)....In sum, the Court refuses to entertain a motion to transfer under 28 U.S.C. §157(b)(5) prior to an examination of its jurisdiction."

Order at 11 n. 8 (emphasis the court's).

Finally, the court remanded all remaining claims by plaintiffs against non-bankrupt defendants to state court. Since these claims were "state law personal injury claims having nothing to do with debtor's bankruptcy[,]" remand was held warranted under 28 U.S.C. §1447(c) ("[i]f at anytime before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded.").

Alternatively, Judge Jack stated that even if there were jurisdiction over the claims against non-debtor defendants, equitable remand under §1452(b) would be appropriate: "Equity counsels that other claims should be swiftly remanded and allowed to continue to proceed in state court." Order at 13. The court found "no reason to retain jurisdiction," but "numerous factors favoring equitable remand." These factors included:

1.  "[A]fter severance, all that remains is an asbestos personal injury case governed by state law and brought by plaintiffs against a group of non-debtor defendants."

2.  "The state court from which this action was removed is certainly better able to respond to questions involving state law;  moreover, that court has already extensively dealt with this case and is well-suited to continue trial on the merits of the state claims."

3.  "Principles of comity likewise support swift remand."

4.  "Garlock's artfully-crafted tale of exponentially increasing litigation caused by duplicative trials of plaintiffs' personal injury claims both in state court and in the Bankruptcy Court is inapplicable and misleading. Garlock conveniently forgets in its response to plaintiffs' motion to remand that not only did Counsel for plaintiffs move in open court to dismiss all claims against the Debtor with prejudice, but plaintiffs additionally asserted *that they would not file any proof of claim in the Debtor's Bankruptcy case*." (emphasis the court's)

5.  "Garlock's claims for contribution are tenuous and remote, at best."

6.  "Finally, and perhaps most importantly, it is prejudicial and inherently unfair to the numerous parties who did not join in removal to interrupt a case already well-rooted in the state court."

Order at 13-15 (footnote omitted).  Each of the factors that impelled equitable remand in the cases before Judge Jack is present here as well.

4

## II.    TRANSCRIPT OF HEARING BEFORE JUDGE JACK

Attached as exhibit B is the transcript of the hearing held on October 30 before Judge Jack. This transcript confirms that out of all asbestos cases in the country, Garlock has removed only those cases in which the plaintiffs are represented by Waters & Kraus.

In the hearing before Judge Jack, she questioned Garlock counsel on this issue:

THE COURT:        Well, is it possible that you just removed this law firm's cases?

MR. CHANEY:       We did.  Yes, that is what we did, Your Honor.

Transcript of hearing in <u>Kennamer v. Able Supply Co.</u> (and related cases), No. C-01-477, Southern District of Texas, Corpus Christi Division, attached as exhibit B, at 89.  Mr. Chaney also stated that the reason Garlock removed only Waters & Kraus cases is that it has "a standing settlement agreement or some type of a global arrangement or some type of understanding" with all other plaintiffs' firms, and therefore doesn't "need the type of consolidation that we're asking for" as to Waters & Kraus cases.  Id. at 86.

## III.    DEPOSITION OF PAUL HANLY

As discussed in plaintiffs' reply brief in support of remand at p. 6, Garlock has never actually sought one cent in contribution from the debtors in this case, notwithstanding that it has resolved hundreds of thousands of cases in which Garlock and the debtors were co-defendants.  The deposition of Paul Hanly, chief national counsel for the debtors, attached as exhibit C, confirms this historical record.  This deposition supplements exhibit C to plaintiffs' reply brief, the affidavit of Jeffrey Simon, to which Garlock objected on hearsay grounds.

WHEREFORE, PREMISES CONSIDERED, plaintiffs respectfully pray that their motions for remand and severance be granted, and that they be granted all other relief to which they are justly entitled.

Respectfully submitted,

Frank Costilla
State Bar No. 04856500
Federal I.D. 1509
Law Offices of Frank Costilla
5 East Elizabeth Street
Brownsville, Texas 78520
(956) 541-4982
(956) 541 3152 telecopier

**WATERS & KRAUS**

Charles S. Siegel
State Bar No. 18341875
Federal I.D. 15736
3219 McKinney Avenue
Suite 3000
Dallas, Texas  75204
(214) 357-6244
(214) 871-2263 facsimile
ATTORNEY FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing was served via facsimile on November 14, 2001.

Shelby A. Jordan
Jordan, Hyden, Womble & Culbreth, P.C.
(361) 884-5616

Mitchell C. Chaney
Rodriguez, Colvin & Chaney, LLP
(956) 541-2170

Melissa Ferrell
(512) 476-7832

Charles S. Siegel

7

# EXHIBIT A

☑002

United States District Court
Southern District of Texas
ENTERED

NOV 0 9 2001

Michael N. Milby, Clerk of Court

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| BILLY ARNOLD AND SYBIL ARNOLD; | § | |
| RICHARD BOYLE AND BARBARA BOYLE; | § | |
| ROBERT McCULLOUCH AND ANNETE | § | |
| McCULLOUGH, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. C-01-478 |
| | § | |
| AC&S, INC., et al., | § | |
| | § | |
| Defendants. | § | |

50

## ORDER

On this day came on to be considered Defendant Garlock Inc.'s ("Garlock") Application and Notice of Removal[1] and Emergency Motion to Transfer Civil Action Pursuant to 28 U.S.C. § 157(b)(5) for Venue Determination as well as Plaintiffs' Motion to Remand for Lack of Subject Matter Jurisdiction, for Mandatory Abstention, or for Discretionary Abstention or Equitable Remand and Plaintiffs' Motion to Sever all Claims against Bankrupt Defendants in the above-styled action. For reasons stated herein, the Court ORDERS that all claims against the Debtor[2] in this action be SEVERED and

---

[1] As an initial matter, Garlock has moved to supplement its Application and Notice of Removal with "inadvertently omitted pleadings." The Court grants Garlock's motion without expressing an opinion on the *reasons* for Garlock's incomplete removal of the instant case.

[2] Garlock removed nine cases at the same time to this Court based on alleged "related to" jurisdiction. The bankruptcy referred to throughout this Order (and in the other eight cases) is Case Number 01-10578, pending in the United States Bankruptcy Court

1

TRANSFERRED to the District Court in Delaware pursuant to 28 U.S.C.
§ 157(b)(5). The Court also ORDERS that all remaining claims be
REMANDED pursuant to 28 U.S.C. § 1447(c) and/or §1452(b) to the 94th
Judicial District Court of Nueces County, Texas, where they were
originally filed and assigned Cause Number 00-5582-C.

## I.   JURISDICTION

Garlock contends that this Court has original jurisdiction of
the Removed Case pursuant to 28 U.S.C. §§ 1334(a)-(b) and that this
case is removable pursuant to 28 U.S.C. § 1452(a).[3]

## II.  FACTS AND PROCEEDINGS

Billy Arnold and Sybil Arnold, Richard Boyle and Barbara
Boyle, Robert McCullough and Annette McCullough (collectively,

---

for the District of Delaware. Initially, Garlock failed to explain
which entities were involved in that bankruptcy (styled "In Re
Federal-Mogul Global, Inc."). Thus, in many of the nine cases,
Federal-Mogul was not a party and it appeared to this Court that
the bankruptcy had nothing to do with the removed case. At the
hearing held on October 30, 2001, Garlock explained, and Plaintiff
concurred, that the following entities were also a part of that
bankruptcy, as subsidiaries and/or affiliates to Federal-Mogul:
Gasket Holding, Inc., Flexitallic, Inc., T&N PLC, and T&N Ltd. In
this Order, these entities are collectively referred to as the
"Debtor," and at least one of them was sued by the Plaintiff in
this action at one time or another. In this case, the relevant
parties in bankruptcy are Gasket Holding, Inc. (sued individually
and as successor in interest to Flexitallic Gasket Co ); T&N PLC,
f/k/a Turner & Newell PLC; T&N PLC (successor in interest to
Keasbey & Mattison); Turner & Newell Industries, Inc., d/b/a United
Gasket Corp.; and Turner & Newell, Ltd., d/b/a United Fabricated.

[3]     As a threshold matter, the other named defendants do not
consent to consent to removal in the bankruptcy context. See Creasy
v. Coleman Furniture Corp., 763 F.2d 656 (4th Cir. 1985); Sommers
v. Abshire, 166 B.R. 407, 409 (E.D. Tex. 1995; Plowman v. Bedford
Financial Corp., 218 B.R. 607, 616 (N.D. Ala. 1998).

@004

"Plaintiffs") brought an asbestos personal injury suit in the 94th Judicial District Court of Nueces County, Texas, against numerous Defendants, including Garlock, on October 12, 2000.   On December 22, 2000, Garlock filed a Cross-Action against "all Co-Defendants" for indemnification and/or contribution.   The Debtor filed for Chapter 11 bankruptcy within 90 days of Garlock's filing of the Notice and Application for Removal. Garlock removed the state court action to this Court on October 19, 2001, asserting the existence of federal question jurisdiction.  Garlock alleges this Court has original jurisdiction of the removed case pursuant to 28 U.S.C. §§ 1334(a) & (b) and that removal is proper pursuant to 28 U.S.C. § 1452(a).  Plaintiffs filed, among other things, (1) a Motion to Remand for Lack of Subject Matter Jurisdiction, for Mandatory Abstention, or for Discretionary Abstention or Equitable Remand; and (2) a Motion to Sever all Claims against Bankrupt Defendants on October 30, 2001.   This case is one of nine asbestos personal injury cases removed by Garlock to this Court.[4] At a hearing held to consider both Garlock's Emergency Motion to Transfer and Plaintiffs' Motion to Remand, counsel for Plaintiffs represented that it had either dismissed or attempted to dismiss the Debtor and all entities related to the Debtor (all involved in the bankruptcy) from the nine lawsuits.  However, some of those dismissals occurred

---

[4]Those cases are as follows: (1) C-01-477; (2) C-01-478; (3) C-01-479; (4) C-01-480; (5) C-01-481; (6) C-01-482; (7) C-01-483; (8) C-01-484; and (9) C-01-485.

3

☑ 005

after removal, and so the Debtor remained a party in some of the nine cases.  Plaintiffs' counsel agreed to dismiss all claims against the Debtor or its subsidiaries (also in bankruptcy) with prejudice in all nine cases.[5] Defendants filed a Response to Plaintiffs' Motion to Remand on November 1, 2001.  The Court now conducts an examination of its jurisdiction over the instant action.

## III. DISCUSSION

### A.   REMOVAL BASED ON FEDERAL QUESTION JURISDICTION GENERALLY

It is well-settled that the removing party bears the burden of showing that removal was proper.  Willy v. Coastal Corp., 855 F.2d 1160, 1164 (5th Cir. 1988).  This burden extends to demonstrating the jurisdictional basis for removal.  Carpenter v. Wichita Falls Indep. Sch. Dist., 44 F.3d 362, 365 (5th Cir. 1995); Delgado v. Shell Oil Co., 890 F.Supp. 1324, 1341 (S.D. Tex. 1995); Albonetti v. GAF Corp. - Chem. Group, 520 F.Supp. 825, 827 (S.D. Tex. 1981).  The removal statutes are to be strictly construed against removal; doubts as to removability are resolved in favor of remanding the case to state court.  Shamrock Oil & Gas Corp. v. Sheets, 313 U.S. 100, 61 S.Ct. 868 (1941); Leffall v. Dallas Indep. Sch. Dist., 28 F.3d 521, 524 (5th Cir. 1994); Butler v. Polk, 592 F.2d 1293, 1296

---

[5]As is indicated, infra, the Court grants Plaintiffs' Motion to Dismiss.

4

(5th Cir. 1979); <u>Walters v. Grow Group, Inc.</u>, 907 F.Supp. 1030, 1032 (S.D. Tex. 1995).

In general, an action is removable to a federal court only if it might have been brought there originally. <u>See</u> 28 U.S.C. § 1441(a); <u>Avitts v. Amoco Production Co.</u>, 53 F.3d 690, 693 (5th Cir. 1995). The venue for removed actions is the district and division in which the state court action is pending. 28 U.S.C. § 1441(a); <u>Polizzi v. Cowles Magazines, Inc.</u>, 345 U.S. 663, 73 S. Ct. 900, 902 (1953); <u>Bacik v. Peek</u>, 888 F. Supp. 1405, 1413 (N.D. Ohio 1993). District courts have original, federal question jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. "Federal courts have jurisdiction to hear, originally or by removal, only those cases in which a well-pleaded complaint establishes either that federal law creates the cause of action, or that the plaintiffs' right to relief necessarily depends on resolution of a substantial question of federal law." <u>Franchise Tax Bd. v. Construction Laborers Vacation Trust</u>, 463 U.S. 1, 27-28, 103 S. Ct. 2841, 2855-2856 (1983). Further, allegations which raise substantial questions of federal common law by implicating important foreign policy concerns confer federal question jurisdiction. <u>Torres v. Southern Peru Copper Corp.</u>, 113 F.3d 543 & n.8 (5th Cir. 1997).

The presence of federal question jurisdiction is governed by the well pleaded complaint rule. <u>Gully v. First Nat. Bank</u>, 299

U.S. 109, 112-113, 57 S. Ct. 96, 97-98 (1936); Powers v. South
Central United Food & Commercial Workers Unions, 719 F.2d 760, 764
(5th Cir. 1983). The well pleaded complaint rule establishes that
a "plaintiff's properly pleaded complaint governs the
jurisdictional determination, and if on its face, such a complaint
contains no issue of federal law, then there is no federal question
jurisdiction." Aaron v. Nat'l Union Fire Ins. Co. of Pittsburgh,
876 F.2d 1157, 1160-61 (5th Cir. 1989)(citing Franchise Tax Bd. v.
Laborers Vacation Trust, 463 U.S. 1, 10, 103 S. Ct. 2841, 2846
(1983)). "Absent extraordinary circumstances, the well-pleaded
complaint rule governs." Carpenter v. Wichita Falls Indep. Sch.
Dist., 44 F.3d 362, 367 (5th Cir. 1995).

   B.  **REMOVAL AND FEDERAL QUESTION JURISDICTION UNDER 28 U.S.C.
       §§ 1452 AND 1334**

   Section 1452(a) provides that a party may remove a claim or
cause of action to the district court where the civil action is
pending when that district court has jurisdiction over the claim
under Section 1334. See 28 U.S.C. § 1452(a). The majority of
courts find that Bankruptcy Rule 9027, which provides for a 90 day
time limit to remove matters, governs the removal procedure. See,
e.g., In re TrafficWatch, 138 B.R. 841 (Bankr. E.D. Texas 1992); In
re Donington, Karcher, Ronan & Rainone, P.A., 194 B.R. 750, 756
(D.N.J. 1996). Defendant has asserted that, pursuant to Rule 9027
of the Rules of Bankruptcy Procedure, the Application and Notice of
Removal were filed properly within 90 days after the order for

6

☑008

relief in the Debtor's bankruptcy case.  Plaintiffs do not disagree with this contention.

Section 1334(b) provides that the district courts have jurisdiction over all civil proceedings arising under Title 11, or arising in or related to cases under Title 11.  See 28 U.S.C. § 1334(b).  Garlock claims that the state court action is "related to" the Debtor's Title 11 case, and thus this Court has removal jurisdiction.  Though the "related to" cases are not limitless, a claim is "related to" a case under Title 11 within the meaning of 28 U.S.C. § 1334(b) if the outcome of the proceeding could conceivably have any effect on the estate being administered in bankruptcy.  See, e.g., Celotex Corp. v. Edwards, 514 U.S. 300, 308 n.6 (1995)(surveying cases);  In re Bass, 171 F.3d 1016 (5th Cir. 1999)(quoting In re Walker v. Cadle Co., 51 F.3d 562, 569 (5th Cir. 1995) ( a claim or cause of action is "related to" the bankruptcy if the "outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankruptcy estate.");  In re Wood, 825 F.2d 90, 93 (5th Cir. 1987); Pacor, Inc. v. Higgins, 743 F.2d 984 (3rd Cir. 1984)(an action is related to bankruptcy if its outcome might alter the rights, options, liabilities, or freedom of action of the debtor in either a positive or negative way", impliedly overruled on other grounds by Things Remembered, Inc. v. Petrarca, 516 U.S. 124, 116

7

☑ 009

S.Ct. 494, 133 L.Ed.2d 461 (1995). Normally, the question would be whether the monetary recovery sought by Plaintiffs and by Cross-Plaintiffs in the state court action would have an effect on the Debtor's estate being administered in bankruptcy.  The only possible claim at issue which might be "related to" the Debtor's bankruptcy is Garlock's cross-action against "all Co-Defendants" for indemnification and/or contribution.  In fact, at the hearing held on October 30, 2001, Garlock conceded that, after Plaintiffs' dismissal with prejudice of the Debtor, the only remaining claim relevant to the removal is Garlock's cross-claim against the Debtor for contribution.  Arguably, claims such as the instant claim for contribution are not even ripe for adjudication. See, e.g., Pacor, 743 F.2d at 995 (discussing indemnification claims in the context of "related to" jurisdiction). Though this Court declines to find that Defendant lacks standing to remove, it should be noted that Garlock's contribution claims are, at best, tangentially and speculatively "related to" the bankruptcy. Compare, for example, Pacor, 743 F.2d at 995)("indemnity action not "related to" the bankruptcy); Matter of Walker, 51 F.3d 562 (5th Cir. 1995) with In Re Dow Corning, 86 F.3d 482, 486 (6th Cir. 1996); In re Harrah's Entertainment, Inc. Securities Litigation, 1996 WL 684463 (E.D. La., Nov. 26, 1996). Assuming, arguendo, that Garlock's claim for contribution is still viable after Plaintiffs' dismissal with

prejudice of the Debtor,[6] the Court finds removal proper based on Section 1452(a) and Section 1334, at least for those claims brought against the Debtor. In the end,  it is clear that "related to" jurisdiction is treated very broadly under the <u>Pacor</u> test adopted by the Fifth Circuit in <u>Wood</u>.  As such, the Court finds that the contribution claims are arguably "related to" the bankruptcy, as they could conceivably have an effect on the estate being administered in bankruptcy.

## C.   SEVERANCE OF CLAIMS AGAINST THE DEBTOR AND TRANSFER PURSUANT TO 28 U.S.C. § 157(b)(5)

Rule 21 of the Federal Rules of Civil Procedure provides that "[a]ny claim against a party may be severed and proceeded with separately." FED.R.CIV.P. 21.  "Severance under Rule 21 creates two separate actions or suits where previously there was but one. Where a single claim is severed out of a suit, it proceeds as a discrete, independent action, and a court may render a final, appealable judgment in either one of the resulting two actions notwithstanding the continued existence of unresolved claims in the other."  <u>United States v. O'Neil</u>, 709 F.2d 361, 368 (5th Cir. 1983).  The Court has broad discretion to sever claims. <u>See</u> <u>Brunet v. United Gas Pipeline Co.</u>, 15 F.3d 500, 505 (5th Cir. 1994).

---

[6]Texas law provides that "[e]ach liable defendant is entitled to contribution from each person who is not a settling person and who is liable to the claimant for a percentage of responsibility but from whom the claimant seeks no relief at the time of submission." Tex. Civ. Prac. & Rem. Code Ann. §33.016(b).

9

Because Plaintiffs no longer have claims against the Debtor in this case and because Plaintiffs' state court personal injury action has already proceeded so far in the state court system, severance of all claims against the Debtor appears warranted. Accordingly, the Court SEVERS out all claims against the Debtor (the "severed claims")[7] from the above-styled cause number. These severed claims shall retain the same cause number, however, as this Court determines all *other* claims are to be remanded for equitable reasons. *See infra* Section III.D.

In addition to removing this case, Garlock moved to transfer the case for venue determinations pursuant to 28 U.S.C. § 157(b)(5) to the District Court in which Debtor's bankruptcy is pending in Delaware. Title 28 U.S.C. § 157(b)(5) provides that

> [t]he district court shall order that personal injury tort and wrongful death claims shall be tried in the district court in which the bankruptcy case is pending, or in the district court in the district in which the claim arose, *as determined by the district court in which the bankruptcy is pending.*

28 U.S.C. § 157(b)(5)(emphasis added); Baumgart v. Fairchild Aircraft Corp., 981 F.2d 824, 829 (5th Cir. 1993). One purpose of Section 157(b)(5) is "to centralize the administration of the estate and to eliminate the multiplicity of forums for the adjudication of parts of a bankruptcy case." A.H. Robins Co. v.

---

[7]It is likely that Garlock's Co-Defendants also have claims against the Debtor. The Court reiterates that *all* claims against the Debtor are severed, whether asserted by Garlock or by other Defendants.

Piccinin, 788 F.2d 994, 1011 (4th Cir.1986), *cert. denied*, 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986). The Fifth Circuit has noted that (1) the language of § 157(b)(5) delineates venue between the *bankruptcy courts* and the *district courts* ("non-core proceedings such as personal injury tort and wrongful death claims shall not be adjudicated in bankruptcy court, but in the Article III district court"); and (2) the district court in which the bankruptcy is pending shall have power to order tried in its own venue personal injury tort and wrongful death claims filed elsewhere, or to order such cases tried in the districts where the claims arose. Baumgart v. Fairchild Aircraft Corp., 981 F.2d 824, 833 (5ᵗʰ Cir. 1993).[8] The Court FINDS that transfer of the severed claims against the Debtor for venue determinations is warranted

---

[8]Garlock would have this Court simply transfer the entire action pursuant to 28 U.S.C. § 157(b)(5) while declining to first determine whether the Court has jurisdiction over the case at all. Though such a course of action would certainly yield the preferred result *for Garlock*, the Court declines to ignore settled principles regarding the limits of the jurisdictional authority of federal courts by simply skipping over an analysis of the propriety of removal in this case and becoming a legal way-station under Section 157(b)(5). 28 U.S.C. § 1447(c) provides that "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case *shall* be remanded." 28 U.S.C. § 1447(c) (emphasis added). A district court should constantly examine the controversies before it in order to determine the presence of subject matter jurisdiction and, if such jurisdiction is found lacking, the district court *must* remand to state court if appropriate, or otherwise dismiss. See Coleman v. Alcolac, Inc., 888 F. Supp. 1388, 1394 (S.D. Tex. 1995). In sum, the Court refuses to entertain a motion to transfer under 28 U.S.C. § 157(b)(5) prior to an examination of its jurisdiction.

11

under 28 U.S.C. § 157(b)(5). Accordingly, the **severed claims**[5] are TRANSFERRED to the District Court in Delaware for a determination of venue.

### D. AS A RESULT OF THE SEVERANCE AND TRANSFER UNDER SECTION 157(b)(5) OF CLAIMS AGAINST THE DEBTOR, ALL OTHER CLAIMS SHOULD BE REMANDED

As this Court has severed out all claims against the Debtor and transferred them to the federal District Court in Delaware, the main claims remaining before this court are state law personal injury claims having nothing to do with Debtor's bankruptcy. As such, remand of all such claims is proper under 28 U.S.C. § 1447(c) ("[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case <u>shall</u> be remanded.") Moreover, even if the Court were to determine that it still had "related to" jurisdiction over the remaining claims by Plaintiff against *non-Debtor defendants*,[10] the Court would find equitable remand warranted under 28 U.S.C. §1452(b). Garlock

---

[5]Again, the Court reiterates that the "severed claims" include *all* claims against the Debtor whether asserted by Garlock or by other Defendants.

[10]Garlock notes that some Courts have held Section 157(b)(5) allows for the transfer of personal injury and wrongful death claims pending against non-debtor defendants who have been sued with a debtor under claims of joint and several liability. <u>See, e.g.</u>, <u>In re Dow Corning Corp.</u>, 86 F.3d 496 (6th Cir. 1996); <u>A.H. Robins Co. v. Piccinin</u>, 788 F.2d 994, 1009 (4th Cir.1986), *cert. denied*, 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986). However, in this case, Plaintiff has claims against non-debtor defendants *and no claims against the debtor*. Such important issues were not adequately addressed by Garlock in its filings.

specifically removed pursuant to 28 U.S.C. § 1452(a). Removals accomplished pursuant to 28 U.S.C. § 1452(a) are subject to motions to remand pursuant to 28 U.S.C. § 1452(b). Section 1452(b) provides that the "court to which... claim[s] or cause[s] of action [are] removed may remand...on any equitable ground." Such equitable grounds include:

> (1) forum non conveniens; (2) a holding that, if the civil action has been bifurcated by removal, the entire action should be tried in the same court; (3) a holding that a state court is better able to respond to questions involving state law; (4) expertise of the particular court; (5) duplicative and uneconomic effort of judicial resources in two forums; (6) prejudice to the involuntarily removed parties; (7) comity considerations; and (8) a lessened possibility of an inconsistent result.

Seale v. Owens & O-M Mgmt Group, Inc., 134 B.R. 181, 184 (Bankr. E.D. La. 1991)(quoting Browning v. Navarro, 743 F.2d 1069, 1076 n.21)(5th Cir. 1984)). Having severed out all claims against the Debtor, this Court finds no reason to retain jurisdiction over the remaining claims and parties. Venue determinations regarding any claims (if there are any such claims truly remaining) against the Debtor by its former Co-Defendants may be dealt with in the District Court in Delaware. Equity counsels that other claims should be swiftly remanded and allowed to continue to proceed in state court.

An analysis of the facts of this case indicate numerous factors favoring equitable remand are present. First, after severance, all that remains is an asbestos personal injury case

governed by state law and brought by Plaintiffs against a group of non-debtor Defendants. The state court from which this action was removed is certainly better able to respond to questions involving state law; moreover, that court has already extensively dealt with this case and is well-suited to continue trial on the merits of the state claims. Principles of comity likewise support swift remand. Additionally, Garlock's artfully-crafted tale of exponentially increasing litigation caused by duplicative trials of Plaintiffs' personal injury claims both in state court and in the Bankruptcy Court is inapplicable and misleading. Garlock conveniently forgets in its Response to Plaintiffs' Motion to Remand that not only did Counsel for Plaintiffs move in open court to dismiss all claims against the Debtor with prejudice, but Plaintiffs additionally asserted that *they would not file any proofs of claim in the Debtor's Bankruptcy case.* This Court acknowledges Plaintiffs' assertions, and hereby GRANTS Plaintiffs' Oral Motion to Dismiss all Claims against the Debtor with Prejudice. Moreover, Garlock's claims for contribution are tenuous and remote, at best.[11] Finally,

---

[11]Even if Garlock is entitled to continue with its claim against the Debtor, it is unclear whether Garlock's claim is anything more than mere boilerplate language inserted in its Answer. Garlock has never attempted to do any discovery of the Debtor in this case, nor has Garlock ever attempted to get contribution from Debtor in the myriad of prior cases in which Garlock has "asserted" cross-claims for contribution against Debtor. Though Garlock devotes much of its Response to Plaintiffs' Motion to Remand explaining to this Court why lack of historical collection and/or prosecution of its contribution claims should not have any effect on this Court's analysis, Garlock utterly fails to

and perhaps most importantly, it is prejudicial and inherently unfair to the numerous parties who did not join in removal to interrupt a case already well-rooted in the state court. In fact, even when given the opportunity to speak at the hearing, not one of the involuntarily-removed defendants stood in support of Garlock's removal. An evaluation of the relevant factors convinces the Court that remand of the remaining claims, after severance of those claims against the Debtor, is the proper course of action.

### E. MANDATORY AND PERMISSIVE ABSTENTION

Section 1334 provides for two types of abstention: discretionary abstention under 28 U.S.C. § 1334(c)(1) and mandatory abstention under 28 U.S.C. § 1334(c)(2). Section 1334(c)(1) provides that:

> Nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

Section 1334(c)(2) states:

> Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing

---

explain the lack of prosecution and development of this contribution claim. Finally, even if Garlock is entitled to contribution, such a claim is arguably not ripe unless and until Plaintiffs succeed in their claim against Garlock in the state court action.

> such proceeding if an action is commenced, and can be
> timely adjudicated, in a State forum of appropriate
> jurisdiction.

Any abstention issues (whether mandatory or permissive) as they

pertain to the contribution claims may, however, be decided by the

District Court in Delaware.

## IV.  CONCLUSION

For the foregoing reasons, the Court ORDERS that all claims

against the Debtor in this action be SEVERED and TRANSFERRED to the

District Court in Delaware pursuant to 28 U.S.C. § 157(b)(5).  The

Court also ORDERS that all remaining claims and causes of action be

REMANDED pursuant to 28 U.S.C. § 1447(c) and/or §1452(b) to the 94th

Judicial District Court of Nueces County, Texas, where the case was

originally filed and assigned Cause Number 00-5582-C.

SIGNED and ENTERED on this the _____ 7th _____ of November, 2001.

JANIS GRAHAM JACK
UNITED STATES DISTRICT JUDGE

16

# EXHIBIT B

Case 1:01-cv-00181   Document 23   Filed in TXSD on 11/14/2001   Page 26 of 156

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
 2                  CORPUS CHRISTI DIVISION
 3   SALLIE KENNAMER,          )    CASE NO. C-01-477
     Individually and as       )
 4   Personal Representative    )
     of the Heirs and Estate    )
 5   of COULTER KENNAMER,       )
     Deceased; JESSIE ESTRADA   )
 6   and MARTHA ROBLES;         )
     WILLIE HARPER and ERMA     )
 7   HARPER; and CHARLES        )
     RAMSEY,                    )
 8                              )
          Plaintiffs,           )
 9                              )
     v.                         )
10                              )
     ABLE SUPPLY COMPANY,       )
11   ET AL.,                    )
                                )
12        Defendants.           )
                                )
13
     ------------------------------------------------------
14
     IN RE:                     )    CASE NO. 01-01578
15   FEDERAL-MOGUL GLOBAL,      )    CHAPTER 11
     INC.                       )    (Pending in the United
16        Debtor.               )    States Bankruptcy Court
                                )    District of Delaware)
17
18
19
20
21
22
23
24
25
```

Case 1:01-cv-00181   Document 23   Filed in TXSD on 11/14/2001   Page 27 of 156

```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
2                 CORPUS CHRISTI DIVISION
3    BILLY ARNOLD and SYBIL  )    CASE NO. C-01-478
     ARNOLD, RICHARD BOYLE    )
4    and BARBARA BOYLE,       )
     ROBERT MCCULLOUGH and    )
5    ANNETTE MCCULLOUGH,      )
                              )
6         Plaintiffs,         )
                              )
7    v.                       )
                              )
8    ACandS, INC.             )
                              )
9         Defendants.         )
                              )
10
     ------------------------------------------------------------
11
     IN RE:                   )    CASE NO. 01-01578
12   FEDERAL-MOGUL GLOBAL,    )    CHAPTER 11
     INC.                     )    (Pending in the United
13        Debtor.             )    States Bankruptcy Court
                              )    District of Delaware)
14
15
16
17
18
19
20
21
22
23
24
25
```

Case 1:01-cv-00181   Document 23   Filed in TXSD on 11/14/2001   Page 28 of 156

1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE SOUTHERN DISTRICT OF TEXAS
2                          CORPUS CHRISTI DIVISION
3     CHARLES PORTER and ROSE    )      CASE NO. C-01-479
      PORTER; DOUGLAS FREEMAN    )
4     and CAROL GASH,            )
      Individually and as        )
5     Personal Representative     )
      of the Heirs and Estate     )
6     of WILBERT GASH,            )
      Deceased,                   )
7                                 )
           Plaintiffs,            )
8                                 )
      v.                          )
9                                 )
      ACandS, INC.,               )
10                                )
           Defendants.            )
11                                )
12    ---------------------------------------------------------
13    IN RE:                      )      CASE NO. 01-01578
      FEDERAL-MOGUL GLOBAL,       )      CHAPTER 11
14    INC.                        )      (Pending in the United
           Debtor.               )      States Bankruptcy Court
15                                )      District of Delaware)
16
17
18
19
20
21
22
23
24
25

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
 2                  CORPUS CHRISTI DIVISION
 3    HARRY SNOW and BETH SNOW,)    CASE NO. C-01-480
      MAURICE GOUPILL; and    )
 4    WILLIAM PICKERING and    )
      ELIZABETH PICKERING,     )
 5                             )
           Plaintiffs,         )
 6                             )
      v.                       )
 7                             )
      ACandS, INC.,            )
 8                             )
           Defendants.         )
 9                             )
10    -----------------------------------------------------
11    IN RE:                   )    CASE NO. 01-01578
      FEDERAL-MOGUL GLOBAL,    )    CHAPTER 11
12    INC.                     )    (Pending in the United
           Debtor.            )    States Bankruptcy Court
13                             )    District of Delaware)
14
15
16
17
18
19
20
21
22
23
24
25
```

Case 1:01-cv-00181   Document 23   Filed in TXSD on 11/14/2001   Page 30 of 156

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
 2                  CORPUS CHRISTI DIVISION
 3  JOHN STERLING and PEGGY  )   CASE NO. C-01-481
    STERLING; CHARLES HORNUNG)
 4  and NERY DIAZ,           )
                             )
 5       Plaintiffs,         )
                             )
 6  v.                       )
                             )
 7  ACandS, INC.,            )
                             )
 8       Defendants.         )
                             )
 9
    ------------------------------------------------------------
10
    IN RE:                   )   CASE NO. 01-01578
11  FEDERAL-MOGUL GLOBAL,    )   CHAPTER 11
    INC.                     )   (Pending in the United
12       Debtor.             )   States Bankruptcy Court
                             )   District of Delaware)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1            IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
2                   CORPUS CHRISTI DIVISION
3   JOAN WEBB, Individually  )   CASE NO. C-01-482
    and Representative of the)
4   Heirs and Estate of      )
    JAMES L. WEBB, Deceased; )
5   PHILLIP FREDERICK and     )
    JOYCE FREDERICK;          )
6   FLORENCE HOWARD,          )
    Individually and as       )
7   Personal Representative   )
    of the Heirs and Estate   )
8   of PRESLEY HOWARD,        )
    Deceased; WALTER          )
9   MERRILL; DANIEL PODOLNY   )
    and VIRGINIA PODOLNY,     )
10                            )
         Plaintiffs,          )
11                            )
    v.                        )
12                            )
    ACandS, INC.,             )
13                            )
         Defendants.          )
14                            )
15  -------------------------------------------------
16  IN RE:                    )   CASE NO. 01-01578
    FEDERAL-MOGUL GLOBAL,     )   CHAPTER 11
17  INC.                      )   (Pending in the United
         Debtor.             )   States Bankruptcy Court
18                            )   District of Delaware)
19
20
21
22
23
24
25
```

Case 1:01-cv-00181   Document 23   Filed in TXSD on 11/14/2001   Page 32 of 156

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
 2                  CORPUS CHRISTI DIVISION
 3   ELIZABETH JACKSON,      )   CASE NO. C-01-483
     Individually and as    )
 4   Personal Representative )
     of the Heirs and Estate )
 5   of JAMES JACKSON,       )
     Deceased; MARILYN       )
 6   PAWSON, Individually and )
     as Personal            )
 7   Representative of the   )
     Heirs and Estate of     )
 8   FLOYD DAWSON, Deceased; )
     VIOLA WOOD, Individually )
 9   and as Personal         )
     Representative of the   )
10   Heirs and Estate of     )
     NATHAN WOOD, Deceased;  )
11   and VIOLA WOOD,         )
                             )
12        Plaintiffs,        )
                             )
13   v.                      )
                             )
14   ACandS, INC.,           )
                             )
15        Defendants.        )
                             )
16
     -------------------------------------------------------
17
     IN RE:                  )   CASE NO. 01-01578
18   FEDERAL-MOGUL GLOBAL,   )   CHAPTER 11
     INC.                    )   (Pending in the United
19        Debtor.            )   States Bankruptcy Court
                             )   District of Delaware)
20
21
22
23
24
25
```

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
 2                 CORPUS CHRISTI DIVISION
 3    CHARLES ARMSTRONG and    )    CASE NO. C-01-484
      BRENDA ARMSTRONG,        )
 4                             )
           Plaintiffs,         )
 5                             )
      v.                       )
 6                             )
      ABLE SUPPLY COMPANY,     )
 7    ET AL.                   )
                               )
 8         Defendants.         )
                               )
 9
      ---------------------------------------------------
10
      IN RE:                   )    CASE NO. 01-01578
11    FEDERAL-MOGUL GLOBAL,    )    CHAPTER 11
      INC.                     )    (Pending in the United
12         Debtor.            )    States Bankruptcy Court
                               )    District of Delaware)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
 2                  CORPUS CHRISTI DIVISION
 3  RICHARD BURDO and      )    CASE NO. C-01-485
    VIOLET BURDO, RICHARD  )
 4  BANDEN and JANICE BANDEN,)
    ROBERT BRENNAN and SALLY )
 5  BRENNAN; THOMAS and RUTH )
    GEMKOW,                 )
 6                          )
 7        Plaintiffs,       )
                            )
 8  v.                      )
                            )
 9  ACandS, INC.,           )
                            )
10        Defendants.       )
                            )
11  ------------------------------------------------------------
12  IN RE:                  )    CASE NO. 01-01578
    FEDERAL-MOGUL GLOBAL,   )    CHAPTER 11
13  INC.                    )    (Pending in the United
          Debtor.           )    States Bankruptcy Court
14                          )    District of Delaware)
15
16
              HEARING ON DEFENDANT GARLOCK, INC.'S
17
                  MOTION TO TRANSFER VENUE
18
              AND PLAINTIFFS' MOTION FOR REMAND
19
20
21
22
23
24
25
```

1              P R O C E E D I N G S

2              THE COURT:  Would you call the case.

3              FEMALE VOICE:  Number is C-01-477 to C-01-485,

4    Sallie Kennamer, et al. versus Able Supply Company,

5    et al.  Would you please state appearances.

6              MR. SIEGEL:  Charles Siegel for Waters & Kraus

7    in Dallas.

8              MR. SIMON:  Henry Simon from Simon Warner &

9    Doby in Fort Worth.

10             MR. SIEGEL:  Michelle Norton from my firm and

11   Juan Mejia from -- or for the plaintiffs.

12             THE COURT:  So that's the plaintiff's table?

13             MR. SIEGEL:  Yes.

14             THE COURT:  Okay.

15             MR. JORDAN:  Shelby Jordan, Mitchell Chaney

16   from Brownsville.  Melissa Ferrell from Austin, and we

17   represent the defendants Garlock.

18             THE COURT:  You're responsible for that

19   brilliantly-crafted removal motion?

20             MR. JORDAN:  Your Honor, I'll take credit on

21   that motion.

22             THE COURT:  Okay.

23             MR. JORDAN:  But I'm responsible for what

24   happened today, put it that way.

25             THE COURT:  All right.  There were no

1  pleadings in there.  Somebody hadn't read the rules,

2  but --

3          MR. JORDAN:  There were no pleadings?

4          THE COURT:  No.  There were a bunch of

5  Interrogatories.  One pleading, no answers.  All live

6  pleadings are supposed to be there.

7          MR. JORDAN:  Yeah, I know I shouldn't take

8  credit.

9          THE COURT:  I didn't know if you wanted to

10  take credit or not.

11          MR. JORDAN:  Well, Your Honor, let me -- let

12  me say, I thought we had -- we do know the rules.  And I

13  thought we had got all live pleadings, all orders, all

14  discovery through its required --

15          THE COURT:  Of course, the big problem in six

16  out of nine of these is that the -- the debtor is not

17  mentioned anywhere in those pleadings.  So I was going

18  to remand them all.  And the plaintiff filed a motion

19  saying there were debtors -- were parties.

20          MR. JORDAN:  Well, Your Honor, there's an

21  attachment that lists all the parties and names the

22  debtor.  The debtor has to be hold up in the motion, I

23  believe, before this court, and they are named with

24  counsel and the --

25          THE COURT:  Except for the -- except for the

1    in re:  debtor, the Federal, whatever, Mogul, whatever,

2    is nowhere in those parties in six of the nine.

3              MR. JORDAN:  Well, in the in re:  Mogul, which

4    we try to -- what I try to explain in the responsive

5    pleading that we're preparing, that's mandated by the

6    Delaware Court that --

7              THE COURT:  You mean that that will be filed

8    at any moment?

9              MR. JORDAN:  Well, we just -- I think it's

10   this morning that we're going -- that we're responding

11   to.

12             THE COURT:  Okay.

13             MR. JORDAN:  And the in -- the in re:

14   Federal-Mogul is the consolidated case, and that's the

15   mandatory citing.  You can't --

16             THE COURT:  Is anybody suing that defendant

17   except for you as a -- for an indemnity claim -- an

18   indemnity claim?

19             MR. JORDAN:  Yes, I believe there's a large

20   number of parties back --

21             THE COURT:  For other than the indemnity?

22             MR. JORDAN:  Well, the plaintiff's suing, of

23   course, for damages and then the --

24             THE COURT:  Well, the plaintiff has

25   dismissed -- has nonsuited you in some of those cases.

1    Though you didn't provide me with that information, it

2    actually was in one of -- one or two of the cases.

3              MR. JORDAN:  I believe we found one that there

4    was a nonsuit of -- of a -- of the debtor in that case.

5              THE COURT:  For plaintiffs, are you suing

6    this -- this --

7              MR. SIEGEL:  No, Your Honor, we're not.  We

8    have no claims against the debtor.  We were in the

9    process of nonsuit -- nonsuiting all of the

10   Federal-Mogul entities in all of the state court suits.

11             Unbeknownst to us, some of these removals

12   occurred before we could get the nonsuits on file.  In

13   those cases, we're asking for a summary severance of the

14   claim against the debtor and dismissal.  We have no

15   claims against that debtor or anybody in that --

16             THE COURT:  Okay.  So you're telling me today

17   you have no claims anywhere -- see, I wouldn't know

18   because I don't have live pleadings in a lot of these

19   cases.  So you're -- you're telling me that you have no

20   claims against this bankrupt debtor?

21             MR. SIEGEL:  In the state court, there may be

22   as of the moment of removal in some of the --

23             THE COURT:  Okay.  But at this moment you're

24   telling me no?

25             MR. SIEGEL:  That's correct.

HEARING

1          THE COURT:  Okay.

2          MR. SIEGEL:  Your Honor, I should also add one

3     other thing.  In the cases where the nonsuit had not

4     been effected prior to the moment of removal, we realize

5     technically the debtor is still in the case in federal

6     court.  We called up the debtor's counsel.  We said, we

7     want to let you out, sever you.  He has no opposition,

8     and that's reflected in our motion for severance.

9          MR. JORDAN:  Your Honor, I'd like to step back

10    and explain to the Court where this is coming down.

11    First of all, counsel had asked that we announce to the

12    court that this -- that we -- that we continue this for

13    several days to allow the parties to join all the

14    pleadings and -- and get it properly before you because

15    there's a number of --

16          THE COURT:  Well, you-all are the ones who

17    wanted the emergency hearing, and everybody's here.

18          MR. SIEGEL:  And we chartered a jet to fly

19    down here, Your Honor.  We're here.

20          MR. JORDAN:  Counsel asked me to attempt to

21    get this set, and asked me if I would announce today

22    defendant is here.

23          THE COURT:  I set it.  I set it at --

24          MR. JORDAN:  No, and --

25          THE COURT:  Didn't I set it three days ago?

1    MR. JORDAN:  Well, let me -- let me step back

2  a little further.  Last Thursday you said that we fax to

3  counsel.  I called Thursday, we got the fax receipt.

4  Yesterday evening he called me and said he'd never seen

5  this before, didn't know it was set, would I agree to

6  continue.

7    And I said, well, we're talking several days.

8  Of course, I would if you really hadn't gotten it, but

9  here's the receipt.  It apparently got to his fax

10  machine, but didn't get to his desk.  But I wasn't going

11  to question him on that issue.  If he tells me that's

12  the truth, I -- I believe that.

13    THE COURT:  No continuance.  So go ahead.

14    MR. JORDAN:  All right.  Let me -- let me, if

15  I can, address the Court -- and, I guess, Your Honor, if

16  I can first address the --

17    THE COURT:  All right.  So I'm going to -- I'm

18  going to address his motion to nonsuit -- to dismiss --

19    MR. JORDAN:  His motion is to sever.

20    MR. SIEGEL:  It's a motion to sever -- for

21  severance.  We would like to sever out the claims

22  against the debtor.  I'm happy to convert it today to a

23  motion for dismissal.

24    THE COURT:  Well, I'm not sure procedurally if

25  I can do that at this moment.

1          MR. SIEGEL:  Right.

2          THE COURT:  So your -- your motion before me

3    now is a motion to sever?

4          MR. SIEGEL:  Right.  So --

5          THE COURT:  Let debtor out and send that on up

6    to Delaware?

7          MR. SIEGEL:  And that's exactly been done in

8    the previous 30 asbestos bankruptcies, that's right.

9          MR. JORDAN:  Your Honor, if I can -- if I can

10   sit and actually address where -- how we got here and

11   why, what counsel's suggesting we do is an issue

12   that's -- that I believe is reserved to the home

13   district court, federal district court in Delaware.  Not

14   the bankruptcy court in Delaware, but the federal

15   district court in Delaware.

16          What is occurring in these cases --

17          THE COURT:  Actually, I've done this many

18   times before.

19          MR. JORDAN:  I'm sorry, Judge?

20          THE COURT:  I've done this before, severed

21   out -- sent out the bankruptcy part to the bankruptcy

22   court.

23          MR. JORDAN:  Well, the --

24          THE COURT:  All claims against that debtor, I

25   sent out to the bankruptcy court, which is mandatory

Case 1:01-cv-00181   Document 23   Filed in TXSD on 11/14/2001   Page 42 of 156

1    actually.

2            MR. JORDAN:  Well, actually the case involved

3    the debtor.  At this point I -- my impression is that a

4    severance after post petition, after the debtor in the

5    case is controlled by the stay, and that the stay has to

6    be lifted before a court can sever out a party that has

7    claims crossed extending by and against the debtor

8    because they had joint claims.

9            Now, but my hunch in this case is as follows,

10   and let me just explain, if I can, in constant what's

11   occurring in this case is that is -- that motivated this

12   removal.  Number one, if we hadn't removed promptly and

13   moved prompt for hearings, there would have been a

14   nonsuit filed against all the -- all the bankruptcy

15   debtors.  And here's what's occurred.

16           THE COURT:  So what's wrong with that?

17           MR. JORDAN:  Well, that's -- let me explain

18   that.  And here's -- here's what's wrong.  In using an

19   example, just this year in Delaware, a W. R. Grace case

20   and various cases have been filed.  What is occurring is

21   this, is that plaintiffs -- assuming there are, say,

22   300,000 claims that are pending nationwide, which is

23   about accurate for most of these particular claims.

24           When a plaintiff -- when a debtor files

25   bankruptcy, then without moving to modify the stay,

1  without -- without any action qualifies for the

2  bankruptcy courts, the plaintiffs send out these mass

3  notices of nonsuit and file their claims in the

4  bankruptcy court.  The result of that is that you have,

5  under 157(B)(5) and 28 USC 1411, a mandatory jury trial

6  on that proof of claim that goes to the Delaware

7  district court.

8            So the Delaware district court now has a jury

9  trial that has to be conducted.  That's the only way to

10 liquidate a personal injury wrongful death claim,

11 300,000 of us.  The state court has the original 300,000

12 jury trials that we had to begin with, without hope of

13 ever being able to determine whether or not that they

14 want those cases severed, whether or not they want to

15 have now 600,000 jury trials.  Now, that's just the

16 first half.

17            When -- when W. R. Grace filed, that

18 happened.  When Gypsum filed, and when the most recent

19 was the -- was the Mogul filing with Garlock, what is

20 now occurring is is three of those occurred this year

21 with codefendants in our lawsuit.  So that you have 300

22 jury trials at federal level.  You now have 300 jury

23 trials for the next Chapter 11 that was filed.

24            You had 300,000 jury trials in the -- in the

25 gestalts where you've severed and send them up.  Those

1  are jury trials that have to be liquidated under Code 11

2  by a jury.  You will send up 300,000 other cases, not in

3  this court, but -- but the global, that is the problem.

4  And you still have the same 300,000 jury trials that

5  existed in Texas.

6          Each one of those are -- are trials.  We've

7  now either doubled, tripled, or quadrupled the same set

8  of facts, the same plaintiff's injury, all so that the

9  plaintiffs can continue this --

10          THE COURT:  Okay.  Wait a minute.  Let me just

11  ask you about your claim.  What your clients have is a

12  claim for indemnification?

13          MR. JORDAN:  Or a contribution.

14          THE COURT:  A contribution?

15          MR. JORDAN:  Yes.

16          THE COURT:  And that's not a jury trial, is

17  it?

18          MR. JORDAN:  Well, it -- it is a jury trial,

19  as far as we know.  There's no law on that yet.  The

20  issue is this, our claim cannot be liquidated unless

21  there is a wrongful death trial.  I mean, that's what

22  our case is.  So the -- so in the whole, says that a --

23  that a wrongful death personal injury case is not a jury

24  trial.  I don't know how you would say what we're going

25  to do is liquidate your claim without it being advised

Case 1:01-cv-00181   Document 23   Filed in TXSD on 11/14/2001   Page 45 of 156

1    as a jury trial.

2              And most -- but the most important aspect of

3    this -- and going back to the policy 157(B)(5), the

4    purpose of that is to stop what is occurring in this

5    particular case.  The purpose of 157(B)(5) is so that

6    there is a single district court who has to try the

7    300,000 Federal-Mogul cases, 300,000 cases in the

8    other -- in the other bankruptcies.  And I can look at

9    this process and decide whether they should be continued

10   to be divided up.  And -- and that's -- that's what --

11   that's what our brief addresses in -- in the context of

12   15075.

13             What -- what I believe that -- that section

14   says is that -- and because we had to remove the

15   division district, there is no -- there are no rules

16   that implement 157.  So you have to come to division

17   district where you are, notwithstanding the fact that

18   157 says only the district court can decide where the

19   case -- where that case is tried.

20             If you were to sever, for instance, you would

21   be and -- and sent up to them, you would not be sending

22   the case to the trial here.  You would be sending the

23   case for that court to decide where that debtor's case

24   would be tried.  Sometimes they're sent to MDL.

25   Sometimes they're actually sent back to state court.

1   And that doesn't happen often, but -- but it does.  And

2   they're -- but they're dealt with in the bankruptcy

3   process but never liquidated in the bankruptcy process.

4           THE COURT:  Would it make a difference if they

5   dismissed with prejudice, the plaintiffs?

6           MR. JORDAN:  If they dismiss the debtor with

7   prejudice?

8           THE COURT:  Yes.

9           MR. JORDAN:  I don't think that -- that would

10  not dismiss our counterclaims or our cross claims, I

11  should say.  It would not dismiss cross claims because

12  we still have a right to contribution.  And what is

13  happened --

14          THE COURT:  I understand that.  But if -- but

15  what you're -- what you're laying out as a scenario,

16  when the -- the plaintiff is filing all over,

17  everywhere, and goes forward in Delaware and goes

18  forward here, and then I think I would agree with you as

19  not -- as not tenable.

20          But if the -- if the plaintiff is

21  dismissing -- is telling you he's dismissing with

22  prejudice --

23          MR. JORDAN: :  Oh, I understand.

24          THE COURT:  -- then that leaves your -- your

25  cross claims or your claims for indemnification, which

HEARING

1   are viewed by some as not quite the same as another type

2   of action.  In fact, may even be -- in one of the cases

3   that I looked at, might even be not quite for education

4   and might even be suitable for remand, which I wouldn't

5   necessarily agree with it.  But it's just somebody's

6   decided that.

7           MR. JORDAN:  Well, I miss -- I miss -- I

8   misunderstood you when you said, a dismiss with

9   prejudice.  I guess to dismiss a debtor with prejudice,

10  and my concern -- or our problem that we are trying

11  multiple cases and can't have a party in because we

12  would be dismissing with prejudice, the case would still

13  be alive for our contribution claims, but they're not

14  going to do that.  They are -- what they're doing -- and

15  I think counsel will tell you, they're not going to

16  dismiss with prejudice.

17          THE COURT:  Okay.  Tell me what you -- then

18  why don't you be real specific.  What are you claiming

19  that --

20          MR. SIEGEL:  Your Honor, right now on the

21  record, we agree to dismiss with prejudice.  All --

22          THE COURT:  But, see, that would -- for some

23  reason, I thought that was what it was.

24          MR. SIEGEL:  Against Federal-Mogul, a --

25          THE COURT:  Because I think you did that in

1   one of those cases.  Wasn't there -- didn't you send me

2   a docket that said dismissal with prejudice?

3             MR. SIEGEL:  It -- it certainly should be

4   done, and on the record, I hereby do it.

5             MR. JORDAN:  And my understanding, counsel,

6   that's -- that dismissal with prejudice means you don't

7   file claims at all in the --

8             MR. SIEGEL:  We will not file in the

9   bankruptcy proceeding.

10            THE COURT:  See, that -- that takes care of

11  one of your big concerns, I would think.

12            MR. JORDAN:  Well, it does in the sense

13  that --

14            THE COURT:  Because I would agree with you, if

15  that was going to happen, they should -- everything

16  should go ahead and go.

17            On the other hand, if that's not what's

18  happening, if there's a dismissal with prejudice --

19  would you want to visit with your counsel?

20            MR. CHANEY:  Your Honor, I'm Mitchell Chaney.

21  And I just know that, historically, what -- what has

22  happened is when there is a bankruptcy filed by one of

23  our codefendants, as Mr. Jordan says, these plaintiff --

24  what happens historically -- and I think there are a lot

25  more asbestos lawyers here than -- who have done it for

```
 1    a much longer time than I have -- the plaintiffs by and
 2    large run and file proofs of claims in the bankruptcy.
 3    And Johns-Manville, the --
 4              THE COURT:  So that -- so what you're saying
 5    is that a dismissal with prejudice doesn't necessarily
 6    keep the proof of claims from occurring?
 7              MR. CHANEY:  Oh, I think historically it never
 8    has.  If, Your Honor --
 9              THE COURT:  Okay.  Let's -- let's -- let's
10    see if we can go there then.  Would that -- would that
11    be --
12              MR. CHANEY:  That is --
13              THE COURT:  They're shaking their heads, no,
14    they're not going to do that.
15              MR. CHANEY:  They're saying, Your Honor --
16              MR. SIEGEL:  Your Honor, if there's some legal
17    bar against our recovering any money, whether in a
18    lawsuit or a bankruptcy court, from an entity, then we
19    can't file a proof of claim.  And to erase any doubt on
20    this floor, I hereby state on the record we will not
21    file proofs of claim to Federal-Mogul.
22              MR. CHANEY:  To get out of the problem that
23    they're in now, they're willing to say we forego the
24    right on these cases to file proofs of claim because we
25    have to have this immediate problem solved.  But when
```

Case 1:01-cv-00181   Document 23   Filed in TXSD on 11/14/2001   Page 50 of 156

1    the nine cases that aren't in front of Your Honor,

2    because we've done this in other cases --

3            THE COURT:  You're -- you're talking about

4    300,000 cases out there, but all I've got before me are

5    nine cases.

6            MR. CHANEY:  I appreciate that.

7            THE COURT:  I don't have an MDL.  If it were

8    removed over here and sent to an MDL, I would be

9    treating it different as -- differently as well.

10           MR. CHANEY:  What -- what we're faced with,

11   Your Honor, is that one -- is one of the other things

12   that is addressed in this -- in our motion and the reply

13   that we were going to file to what got filed today by

14   the plaintiffs, was what they do -- now, let me just

15   tell you about the awkward handcuff situation I am in in

16   the state court.

17           I have -- and the reason that this bankruptcy

18   is so important to my client, the -- the movant here and

19   the defendant who have moved, is we manufacture

20   gaskets.  One of the main subsidiaries of Federal-Mogul,

21   one was called Gasket Holdings, and the other is

22   Flexitallic.  In virtually every one of the nine cases,

23   Flexitallic gaskets are ID'd as a gasket that the

24   plaintiff works with or worked with along with Garlock.

25           What happens in the state court, now that

1    Flexitallic is in bankruptcy, is the plaintiffs get up

2    and argue to the state court judge that since there is a

3    bankrupt defendant, I can't try to show that the

4    plaintiff was exposed to that -- that

5    asbestos-containing product, although on the one hand

6    they want to tell the jury, and do very often, every

7    exposure counts, every exposure is causative.  And in

8    the --

9              THE COURT:  Like you're wearing those little

10   X-ray things; is that what you're saying?

11             MR. CHANEY:  Yeah, that's the way they portray

12   it.  But then they ask the judge in the state court

13   case, don't let Mr. Chaney talk about Flexitallic, even

14   though the plaintiffs themselves ID Flexitallic as a

15   product they were exposed to.  So my -- my ability to

16   try to get some -- some distribution of the fault,

17   should there be any, is completely now taken away.

18   Where if under 157 --

19             THE COURT:  How does that happen?  How could

20   that -- how -- how does that position work?

21             MR. CHANEY:  I have their -- their motions in

22   limine from many, many cases where they try to get the

23   judge to say I can't talk about the exposure --

24             THE COURT:  About a third-party liability

25   that's not before them?

1          MR. CHANEY:  That's what they say.  And I have

2   the motions in limine that I can show you, Your Honor,

3   that we just were getting ready to go to pick a jury in

4   Brownsville in a case.  And they get up and they tell

5   the judge, I can't talk about any of these exposures.

6   Well, this is one way we're --

7          THE COURT:  Now, I don't know about the

8   technicalities of exposures, but I -- I thought you

9   could always bring up a third party.

10          MR. CHANEY:  You can in -- except in these, in

11   my opponent's eyes, once the bankruptcy is filed, I

12   can't mention it.  And -- and I have their motion in

13   limine where they -- where they say that.

14          THE COURT:  I can see not mentioning that the

15   person is bankrupt.

16          MR. CHANEY:  Well, they --

17          THE COURT:  You ought to be able to lay it off

18   on somebody.

19          MR. CHANEY:  They --

20          MR. SIEGEL:  No, that's not that we would be

21   entitled to argue that Flexitallic or any other entity

22   is the sole cause of --

23          MR. CHANEY:  That's all they --

24          MR. SIEGEL:  -- of the disease.  They're --

25   what they're asking you to do is amend the Texas Civil

Case 1:01-cv-00181   Document 23   Filed in TXSD on 11/14/2001   Page 53 of 156

1    Practice and Remedies Code.  We have no claim now that I

2    have nonsuited with prejudice Federal-Mogul or any of

3    its subsidiaries.  We have no claim against that entity,

4    either a lawsuit or in bankruptcy court.

5            We can't recover any money from them, and

6    therefore they can't recover contribution from them,

7    because the contribution or indemnity claim, unless it's

8    contractual, which these aren't, are completely

9    derivative of the plaintiffs' direct claim against

10   Federal-Mogul.  We don't have any claim any longer, and

11   therefore they don't.  And the complaint that he's

12   making is a complaint about what the Texas Civil

13   Practice and Remedies Code says about allocation of

14   fault among -- among different tort cases.

15           MR. CHANEY:  Your Honor, that's a

16   misrepresentation of what the Civil Practice and

17   Remedies Code says.  I would suggest that -- that to --

18   to, Your Honor, that what it says is there are -- there

19   is a practice by which I can name parties that I think

20   are responsible third parties and ask for a line --

21           THE COURT:  A finding?

22           MR. CHANEY:  Yes, by the jury.  -- did this

23   party contribute.  And to the extent that I, as one of

24   the counsel for a defendant, can give the liability to

25   other parties under the scheme of the Civil Practice and

1  Remedies Code, I may not have to share with -- with the

2  other parties a disproportionate amount.

3         If my percentage or my client's percentage is

4  more than 15 percent, then I -- they can recover all of

5  the damages under the Civil Practice and Remedies Code

6  against anyone who is more than 15 percent responsible.

7  What they want -- what we want is for our ability to

8  have our cross action heard in one trial with -- with

9  all of the other persons or parties that have

10  contributed to cause the disease allegedly of the

11  plaintiff.  And in every case that was removed to your

12  court, Judge, the plaintiff said, I worked with

13  Flexitallic or I worked with Gasket Holding products,

14  and they caused my disease.

15         And we -- that's all we want to be able to

16  portray to one jury one time.  And if the -- if the

17  bankruptcy -- or the U. S. District Court judge in the

18  home district decides it needs to be in Corpus or it

19  needs to be wherever, that's fine.  But we'll -- we'll

20  have just one time when that can happen.

21         And that's all we're saying is this is a very

22  inefficient -- and I understand the Court's offer to my

23  opponent about, well, we just nonsuit with prejudice,

24  which is easy to do in nine cases to get back to state

25  court, but that's not what has historically happened.

1  And -- and that doesn't take care of my cross action, my

2  ability to portray what has happened to the jury.

3          THE COURT:  What is your -- how did -- what's

4  the -- what's the basis of your cross action?

5          MR. CHANEY:  If they -- the plaintiffs have

6  said they were exposed to this bankrupt defendant's

7  products, and that was, in fact, a cause of the

8  plaintiff's disease.

9          THE COURT:  And it doesn't have to be the sole

10  cause is what you're saying?

11          MR. CHANEY:  That's what they say.  I say that

12  it does not.  But they say that the only way I could get

13  a line for Gasket Holdings is if I prove to the jury

14  that it was the sole cause.  And, of course, the state

15  of the science wouldn't allow anyone to do that unless

16  the plaintiff said that's all I worked around, and they

17  never do.  They say, I worked around all these

18  products.

19          So, I mean, they -- they're -- they put a

20  scientific impossibility for me to prove that it's the

21  sole cause when they say in their own pleadings it's

22  everything.  Therefore, I can't talk about some of the

23  things it really was.  And it's just that, you know, in

24  my experience, Your Honor, a completely unworkable and

25  unfair situation.  And we've been here as defendant

1    after defendant has fallen and now, you know, the -- the

2    realistic historic story is not portrayed to the jury --

3            THE COURT:  Well, what discovery has your

4    client done against the -- against the debtor?

5            MR. CHANEY:  We've been in many --

6            THE COURT:  What -- what discovery?  Have you

7    taken their depositions?

8            MR. CHANEY:  There have been many, many

9    depositions taken.

10           THE COURT:  Have you taken their depositions?

11           MR. CHANEY:  In these cases?

12           THE COURT:  Yes.

13           MR. CHANEY:  In these nine?  I don't believe

14   the -- I could be wrong, Your Honor.  I have a sheet

15   that shows all the discovery.  I don't know if actual

16   representatives of Flexitallic or Gasket Holdings

17   company were taken in any of these cases because what

18   happens usually, Judge, is everybody -- because this

19   litigation has been going on for a long time, every one

20   has everybody's depositions ad nauseam.

21           There's no more that could really be

22   discovered against Garlock or Flexitallic or 3M because

23   they've all been given so many times.  You don't just go

24   in and redo all the depos.  Everybody really knows what

25   the testimony is.  So there will be ID.  For example,

Case 1:01-cv-00181   Document 23   Filed in TXSD on 11/14/2001   Page 57 of 156

1    Judge, in these cases there are standing orders for

2    discovery in the various counties, and the plaintiffs

3    have to show what products they ID, either by work

4    history sheet --

5         THE COURT:  If one of these companies file

6    bankruptcy in Corpus Christi, one of these defendants --

7         MR. CHANEY:  Yes, ma'am.

8         THE COURT:  -- all of the -- you're saying

9    that all of the asbestos cases or all these cases would

10   come to the Corpus Christi district court?

11        MR. CHANEY:  For a determination of where they

12   would ultimately be tried, it's my understanding of the

13   rule Mr. Jordan is talking to.  Now, you're kind of back

14   in -- in his area of expertise.  But that's what I

15   understand that rule says.  So that there can be the

16   efficient and expeditious handling of claims where there

17   is a bankrupt defendant.

18        And it may be, Your Honor, I don't know what I

19   would propose, that the U. S. District court in

20   Delaware, with the input of the bankruptcy judge, and

21   you know certainly better than I do what kind of

22   interaction there is, may decide it's in the best

23   interest of everyone to sever or have a few trials or to

24   do something to liquidate the case.

25        My understanding also, the bankruptcy code --

1    and Mr. Jordan can answer this better, Your Honor -- is

2    that if we don't liquidate our cross action, that we

3    lose it in -- in terms of when the bankruptcy plan or

4    this debtor is confirmed.  So if there's a -- and the

5    only way we can liquidate it is by going to trial.  So

6    to see if -- and then, you know, they will oppose us

7    putting this debtor on the blank because they'll say

8    it's a bankrupt debtor.

9          So we -- we stand a chance of losing

10   state-wide our ability to go and liquidate our cross

11   actions because we don't know when the plan of the

12   debtor will be confirmed.  And if a cross action isn't

13   liquidated by the time the plaintiffs confirm, we don't

14   get anything back from them.

15         So my understanding of the rule that

16   Mr. Jordan has cited is that that's why it's more well

17   suited for the home district judge to decide these venue

18   remand considerations.  And that's all we're asking for,

19   Judge.  And I'll step away and let Mr. Jordan take

20   over.

21         MR. JORDAN:  Your Honor, I --

22         THE COURT:  Well, let me -- let me ask the

23   plaintiff to address just those recent arguments.

24         MR. SIEGEL:  Yes, Your Honor.  They don't have

25   any claim against Flexitallic anymore, Gasket Holdings.

```
 1    I've nonsuited those claims with prejudice.  We can't

 2    recover any money against Flexitallic.  I'm calling it

 3    Flexitallic, not the whole name.  Therefore, Flexitallic

 4    won't ever -- therefore, Garlock won't ever pay or

 5    overpay for anything that Flexitallic really owed us

 6    because Flexitallic now is completely immune from any

 7    claim against us.

 8              I want the Court to understand that these are

 9    nine asbestos cases that were pending in Nueces County.

10    In at least one of them, a man is dying of

11    mesothelioma.  His case has already been continued

12    twice.  It's now set for trial again the first part of

13    next year.  What they're asking you for is -- and

14    listening to Mr. Jordan and Mr. Chaney, I was thinking

15    that all of that argument is really the province of the

16    law reviews.  It's the province of congressional

17    testimony.  It is completely barred by the precedent

18    cited in our motion for remand.

19              Think about what they're asking you for.

20    They're asking you to totally ignore the delirium

21    (phonetic) jurisdictional deficiency here and transfer

22    this -- all of this to Delaware, which would buy them

23    many months of time.  And Mr. Sterling, by the way, the

24    man who's dying of mesothelioma, will be a dead man.

25    They're asking you to send this case to Delaware;
```

1    Delaware.   The Delaware district court is governed by

2    the third circuit -- by the law of the third circuit.

3            The leading case that we cite in our motion

4    for remand is Pacor, Inc. versus Higgins, decided by the

5    third circuit in exactly this circumstance, a claim by

6    the plaintiff against a bankrupt asbestos defendant

7    Johns-Manville and several nonbankrupt defendants.  And

8    the third circuit held the claim by the plaintiff

9    against the -- against the nonbankrupt companies and the

10   nonbankrupt companies' claims for -- against

11   Johns-Manville for contribution, which existed.

12           As of today, the claims against Flexitallic

13   don't even exist anymore.  But the claims against

14   Johns-Manville, by goes the claim and of the

15   contribution defendant, did not constitute related-to

16   claims, such as to be within the district court's

17   bankruptcy jurisdiction.  That is exactly the law that

18   will govern the district of Delaware in this case.  Why

19   they are asking you to transfer this to Delaware so that

20   the Delaware court can enter a ruling, which is a

21   foregone conclusion --

22           THE COURT:  Which is not related?

23           MR. SIEGEL:  -- which is not related, is

24   beyond me.

25           I think the court should also know, because we

Case 1:01-cv-00181   Document 23   Filed in TXSD on 11/14/2001   Page 61 of 156

1   heard a lot about the concern for 300,000 asbestos

2   claims, centralization is a constant theme you hear

3   in -- you've seen in their motion.  Guess what?  Only

4   asbestos claims represented by my firm Waters & Kraus

5   have been removed to federal court.  Nine here in Corpus

6   Christi; many in Galveston; many in El Paso.

7          In the last ten days, my firm has had about 80

8   asbestos cases removed to federal court.  We are

9   struggling at my firm to take this as some sort of

10  perverse compliment to our practice.  But, frankly, it

11  has turned our firm upside down, hence -- and I

12  apologize for this -- the box of pleadings delivered to

13  the federal court today, such that it had to be screened

14  by security.  But virtually every case in our office was

15  removed over the last ten days, and we have been

16  scrambling to file motions for remand in all of the

17  district courts around Texas.

18         Our firm probably represents fewer than five

19  percent of the asbestos plaintiffs in the state, and

20  certainly fewer than one percent of the asbestos

21  plaintiffs in the country.  But for some reason, only my

22  firm's cases were removed to federal court; thus, I'm a

23  little bit dubious of the concern about centralization

24  here.  In any event, as I said, all of that is for the

25  law reviews; all of that is a complaint, well taken or

Case 1:01-cv-00181   Document 23   Filed in TXSD on 11/14/2001   Page 62 of 156

1    not, about the way the Texas statutory allocation of

2    fault among tortfeasors operates in personal injury

3    trials.

4            And it's really a complaint about federal

5    bankruptcy law, which is very clear on this issue and

6    which says that inchoate claims for contribution and

7    indemnity, even assuming they exist, are not related to

8    the bankruptcy, such that there is bankruptcy

9    jurisdiction.  And that is certainly true of the

10   plaintiffs direct claim against the nonbankrupt

11   codefendants.  That was the case -- that was the ruling

12   of the third circuit in the Johns-Manville bankruptcy.

13   That was followed very shortly by the fifth circuit in a

14   case holding that the -- the benefits of the automatic

15   stay do not apply to the nonbankrupt codefendants.

16           When Johns-Manville went bankrupt, all the --

17   all of its codefendants said, hey, we need the stay to

18   apply the claims against us too because of various

19   equities, various complaints they made about how unfair

20   it would -- it would be to defend cases without

21   Johns-Manville in the courtroom.  That's -- that's the

22   Wentworth case that we cite in our brief.

23           The fifth circuit told them no.  The -- the

24   bankruptcy stay applies to Johns-Manville, but it does

25   not apply to the claims against non-debtor codefendants,

1   and that has always been the law.  Again, we have

2   plaintiffs; we have some widows; we have in one case a

3   woman suffering from asbestosis; we have some people

4   whose cases were set for trial, some not; we have

5   Mr. Sterling who is dying of mesothelioma, and his case

6   has already been continued twice.  There is

7   absolutely --

8           THE COURT:  Is there some agreement that

9   discovery then between the defendants and other cases is

10  usable in your case?

11          MR. SIEGEL:  As a general matter --

12          THE COURT:  Had anybody asked for that

13  agreement?

14          MR. SIEGEL:  As a general matter, depositions

15  taken among -- by different parties in asbestos

16  litigation does -- it is somewhat usable in ongoing --

17  in ongoing asbestos trials.  That's certainly true, and

18  Mr. Chaney is right about that.  However, Your Honor,

19  inquire about whether they've ever taken any discovery

20  against Federal-Mogul, because apparently that's the

21  most important thing they have in this case is their

22  cross claim against Federal-Mogul and Flexitallic.

23          We called up the chief counsel of Flexitallic,

24  and we said we're going to dismiss you.  Do you have any

25  problem with that?  No.  By the way, has Garlock ever

1    taken any discovery against you?  No.  Has Garlock ever

2    sent you an interrogatory?  No.  Has Garlock ever

3    demanded formally or informally one cent in contribution

4    from you in the 250,000 asbestos cases you've resolved?

5    No.  Have you ever paid Garlock one cent in

6    contribution?  No.  Has Garlock's claim for contribution

7    against you ever even entered your mind until now?  No.

8              That is an exhibit to our -- we tried to take

9    his deposition last week.  That was quashed or objected

10   to by Mr. Chaney.  We've noticed it again for Friday,

11   but we recounted all of that information in an affidavit

12   by our lawyer Jeffrey Simon who spoke to him.

13             THE COURT:  Do you know that to be untrue,

14   those representations?

15             MR. CHANEY:  They did give me a notice for 24

16   hours to take a telephonic deposition of --

17             THE COURT:  No, no.  Misrepresentations about

18   your -- the status of your discovery against this

19   third-party debtor?

20             MR. CHANEY:  We have, Your Honor, to my -- I

21   have not handled Garlock litigation nationwide, and

22   this --

23             THE COURT:  So you can't say it's not true or

24   true?

25             MR. CHANEY:  I can't say that we have never

1    attempted to get any enforcement or cross action.  What

2    I can say is the cases I've handled, Your Honor, is what

3    has happened historically when I first started to do

4    some work for Garlock, the -- the settlement value was

5    $2,500 or $5,000 for somebody with a cancer like

6    Mr. Sterling.

7              Now, because all of these other -- and so, you

8    know, practically, Your Honor, you wouldn't chase a

9    codefendant down when you could resolve a case for 2,500

10   or $5,000.  As a result of all of the bankruptcies of

11   all of the --

12             THE COURT:  So that wouldn't be an unusual

13   situation then if that were true?

14             MR. CHANEY:  If that were true?

15             THE COURT:  The plaintiffs' representations of

16   the state of your discovery against the third-party

17   debtor?

18             MR. CHANEY:  If -- if we had never chased them

19   down for --

20             THE COURT:  Right.

21             MR. CHANEY:  -- reimbursement of the $5,000?

22   I -- I presume that is true, Your Honor, historically.

23   But what the point I was leading up to, Judge, is this

24   has all changed.  Now, the people who manufactured the

25   vast majority of the asbestos-containing products are

1    all in -- or not all.  But a huge number of them, as the

2    Court well knows, are in bankruptcy.

3            THE COURT:  I don't know this.

4            MR. CHANEY:  Well, that is the truth, and I --

5            THE COURT:  Just assume I don't know

6    anything.

7            MR. CHANEY:  Okay.  The truth is --

8            THE COURT:  That's probably much closer to the

9    mark.

10           MR. CHANEY:  John -- well, I'm not far behind

11   you, Your Honor, because I've not been involved in this

12   docket like -- like Mr. Siegel has.  But Johns-Manville

13   was the largest manufacturer; went bankrupt years ago.

14   OCF, the --

15           THE COURT:  So what happened to all those

16   claims against that defendant?

17           MR. CHANEY:  Well, I'm sure that if you ask

18   him, his clients filed proofs of claim in the vast

19   majority of them.

20           THE COURT:  Did yours?

21           MR. CHANEY:  I don't think my -- my client

22   Garlock ever filed a proof of claim because what was

23   happening was we weren't a target.  We were a

24   peripheral, tertiary, low-on-the-food-chain defendant.

25   And now the demands have gone from 5,000 to 600,000.

1   The truth is, you know, at some point in time, we're all

2   going to be in --

3          THE COURT:  When did that happen?

4          MR. CHANEY:  That happened probably about in

5   the last three to five years -- the last two to three

6   years where the -- the focus --

7          THE COURT:  Okay.  So what companies have

8   gone -- what other -- what other codefendants have gone

9   bankrupt in that three- to five-year period?

10         MR. CHANEY:  Oh, I don't know that I could

11  even list them.  All these people would have a much

12  better idea than I, but --

13         THE COURT:  Well, did you file proofs of claim

14  in any of those?

15         MR. CHANEY:  I don't think we filed proofs of

16  claim in any of those.  I'm sure the plaintiffs did, but

17  I don't think we did.

18         THE COURT:  Okay.  But you filed none?

19         MR. CHANEY:  I filed --

20         THE COURT:  And you had -- you had indemnity

21  claims in those cases too?

22         MR. CHANEY:  But -- but, Your Honor, what

23  happened --

24         THE COURT:  Did you have indemnity claims in

25  those?

1          MR. CHANEY:  Yes.  But once we settle, Your

2     Honor, under Texas law, our indemnity claims are

3     extinguished because we become a settling tortfeasor.

4     So at some point in time, the economics of all this have

5     changed to where, against a company like Gasket Holdings

6     or Flexitallic, it has now become important to pursue

7     the cross actions to have them heard in one location.

8     The economics have changed of -- of this whole docket,

9     drastically, drastically.

10          MR. SIEGEL:  They should petition the

11     legislature then, Your Honor, if the situation has

12     changed or a change in the bankruptcy codes will allow

13     this to occur.

14          MR. JORDAN:  If I may say, let me just report

15     to the court, there is over 150 Chapter 11's in Delaware

16     this year alone in asbestos-related companies.  The

17     economics have absolutely and critically changed.

18     Congress already enacted 157(B)(5) in anticipation of

19     centralizing these types of proceedings.

20          In what Mr. Chaney is telling you, we were

21     preparing, in fact, the response that we were going to

22     file.  It had a chart that included not just the

23     proliferation of litigation, that's the first time I've

24     heard today they're dismissing without prejudice or with

25     prejudice because we got copies of dismissals on all

Case 1:01-cv-00181   Document 23   Filed in TXSD on 11/14/2001   Page 69 of 156

1    without prejudice.

2          This is the first time I've ever heard they

3    would be willing to do that in these eight cases.

4    But -- but what our advisement will show you is that in

5    1991, these cases settled for $500.  In the year 2000,

6    the demand for 600,000, and it's only because someone

7    who was, as Garlock, a small company --

8          THE COURT:  Are you telling me because the

9    defense pool has gotten smaller?

10         MR. JORDAN:  We've become targets all of a

11    sudden.  There's nobody else to pay.  In fact, they say

12    that to you.  There's no -- these other people are in

13    bankruptcy.  You're going to have to pony-up because

14    there's nobody left.  And that's what's happened.

15         And -- and 157(B)(5) was used in the

16    Dow Corning case to bring every single contribution

17    claim to the home district court, every shareholder

18    claim to the home district court.  And even that case

19    was -- was not the -- it wasn't the type of case that is

20    similar to what's occurring down in Delaware.  And what

21    is happening is the filing in the bankruptcy --

22         THE COURT:  Do any of -- any of those cases

23    that you're talking about where the plaintiff has said,

24    I am -- I am not -- I'm dismissing with prejudice

25    against the debtor?

1          MR. JORDAN:  None -- none of those cases that

2  I'm aware of has that -- has that ever occurred.  In

3  fact, I haven't told the court that -- that surely I

4  would have the opportunity to respond to that by going

5  back and looking at some of the cases and being sure

6  that --

7          THE COURT:  I guess what I'm saying is that it

8  does seem to be a significant difference from --

9          MR. JORDAN:  I think -- I think --

10          THE COURT:  When -- when certainly I can see,

11  like I told you before, if they weren't doing that and

12  they were thinking about suing, again, the bankruptcy

13  court, just that defendant, everything should go

14  together.  And I understand that.  I think this appears

15  to be a different capuvich (phonetic), and especially

16  when you're just -- when all you have left are indemnity

17  claims against -- between the codefendants.

18          And I understand that that's a problem because

19  the pool is shrinking.  That's not a problem that I

20  think I need to deal with.  That's a problem that the

21  shrinking -- the shrinking pool specialists need to

22  tackle.  I mean, I can't deal with that, but I can look

23  at the plaintiffs form and the -- and the defendants

24  that are left.

25          And -- and I'm not sure that your

1    indemnification claim is cognizable at this point

2    because it's not ripe.  Yet, whether I should even be

3    looking at it as a -- as a claim at this point and

4    then -- and what he says does make good sense.  If you

5    want to address that and tell me I don't have any sense

6    either, which is fine.

7              MR. JORDAN:  I wouldn't do that.

8              THE COURT:  No, my husband does; so don't

9    worry about it.  He doesn't really.  I'm just kidding.

10             If you -- if the plaintiff gives up their

11   claim against your codefendant, then your claim for

12   indemnification certainly has to shrink, if not

13   disappear.

14             MR. CHANEY:  I -- respectfully, Your Honor, I

15   would disagree with that because under Texas law, the

16   plaintiffs doesn't need to bring a claim for me to have

17   a valid contribution claim against any defendant.

18             THE COURT:  Well, I understand against an

19   insurance carrier, but I think if some -- if they

20   haven't had the same liability you do to the plaintiff

21   before you get indemnification from them on a claim,

22   that's right against you.

23             MR. CHANEY:  That's only for contractual

24   indemnity.  Under common law indemnity, within 30 days,

25   Your Honor, of my being brought in as a defendant, I can

1   bring in any third party I want who I think shares my

2   liability.  Now, in this case what happened is they sued

3   us, and so while the case was pending, I found a cross

4   action against them for contribution.

5          It's not extinguished by his saying, we'll

6   never sue you again, because I could still in a court

7   say, you know, Mr. Sterling worked only with Flexitallic

8   gaskets, not with Garlock gaskets.  To the extent you

9   think, jury, that is a dangerous product, it's because

10  he worked with both gaskets, and his dismissing doesn't

11  affect my cross action or my ability to pursue any

12  defendant.

13          MR. SIEGEL:  It does, Your Honor.

14          MR. CHANEY:  It does not.

15          MR. SIEGEL:  He said I can bring a cross claim

16  against anyone who shares my liability.  That was his

17  word.  Since we don't have -- no longer have any

18  claim --

19          THE COURT:  I think I've got it.

20          MR. SIMON:  Your Honor, could I -- could I

21  speak briefly just on a bankruptcy issue on one thing?

22          THE COURT:  Are you the plaintiff bankruptcy

23  person?

24          MR. SIMON:  Yes, ma'am.

25          THE COURT:  Okay.  Let me -- let him finish,

1    and then I want to hear from you.

2            MR. SIMON:  Thank you.

3            THE COURT:  Because you've been standing in

4    line there for a while.

5            MR. SIMON:  I have, Your Honor.

6            MR. CHANEY:  I -- I feel very strongly that

7    what Mr. Siegel says about my ability to maintain a

8    cross action for contribution once his client says I'm

9    not going to go after that defendant anymore, and -- and

10   just take a simple auto product case.

11           Okay.  They -- they sue auto manufacturer,

12   whatever the car was they say didn't work.  It caught on

13   fire, as a result of a drunk driver hitting the

14   plaintiff's car.

15           THE COURT:  Okay.  Plaintiff sues you, the car

16   person.

17           MR. CHANEY:  Right.

18           THE COURT:  You sue the driver.

19           MR. CHANEY:  I sue the drunk driver of the

20   other car.

21           THE COURT:  You sue the drunk driver, but

22   that's different as well because in a -- in a case

23   between the plaintiff and you, you're only responsible

24   for what the part that your defective product caused.

25   You're not responsible for the -- for what the drunk

1    driver did.

2                MR. CHANEY:  But the only way I can show what

3    part I'm responsible for is to have the jury answer what

4    part the drunk driver is responsible for.  Otherwise, if

5    there's just two blanks, X motor company and the

6    deceased re:  that was --

7                THE COURT:  But you're talking about

8    contributory negligence.  Isn't -- is that what you're

9    saying?

10               MR. CHANEY:  No, ma'am.

11               THE COURT:  This is contributory negligence?

12               MR. CHANEY:  No, Your Honor.  I'm saying,

13   assume I'm in a car, and I'm rear-ended by a drunk

14   driver, and my -- my widow sues the car company.

15               THE COURT:  Well, you don't need to be worried

16   about it at all.

17               MR. CHANEY:  Right.  That would -- then would

18   be moot.

19               THE COURT:  I'm sorry.

20               MR. CHANEY:  Then -- then what happens is

21   my -- my estate, my family, they sue the car company.

22   The car company will bring in the drunk driver saying,

23   you know, it wasn't our car.  It was the drunk driver.

24               The family of the deceased can't just get up

25   and say, well, you know what, we're not going to sue the

1   drunk driver, and now all that goes to the jury is my

2   estate versus the car company.  The car company has the

3   right to maintain, independent of the plaintiff's

4   allegations, a cause of action for contribution or

5   indemnity, if the jury were to find that the fault was

6   the sole cause of the drunk driver, that third party.

7           THE COURT:  Well, see, that's just what he's

8   saying.  He's saying you still have the right to say --

9   to put that person on the jury charge as the sole

10  cause.

11          MR. CHANEY:  Judge, I got a transcript from a

12  hearing that I could show you and their motion in limine

13  in every case where they say I can't do that.

14          THE COURT:  I thought he just stood up and

15  said you can always point to them as sole cause.

16          MR. CHANEY:  Well, I have a lot of problems

17  with sometimes what somebody says here versus --

18          THE COURT:  Is that -- did you say that?

19          MR. SIEGEL:  I did, Your Honor.  And,

20  undoubtedly, counsel will get the transcript from this

21  hearing and use it against us in every --

22          THE COURT:  Did you not stand up and say you

23  have no objection to them using this debtor person as --

24  as sole cause --

25          MR. SIEGEL:  Absolutely.

1          THE COURT:   -- as long as nobody mentions that

2    they're in bankrupt?

3          MR. SIEGEL:   That's right.   They can -- they

4    can say they're in bankruptcy.

5          MR. CHANEY:   But he'll tell the judge, Your

6    Honor, they can't say it's the sole cause because

7    everything causes it.   It all causes it.

8          THE COURT:   No.   Wait; wait.

9          MR. SIEGEL:   I'm binding myself right now.

10          MR. CHANEY:   But he'll say, but Chaney can

11    never prove it's the sole cause because --

12          THE COURT:   That's not my problem.

13          MR. CHANEY:   I understand that.

14          THE COURT:   I mean, that's just the Texas

15    law.

16          MR. CHANEY:   All I'm trying --

17          THE COURT:   To get him on the -- to get him on

18    the list for contributory negligence, they have to be in

19    line for being sole cause.   Is that right?

20          MR. CHANEY:   No.   No, Your Honor.

21          THE COURT:   That's what he's saying.

22          MR. CHANEY:   And he's incorrect.

23          THE COURT:   I thought you just said that.

24          MR. CHANEY:   No.   What I'm saying is all I

25    have to do to get them on a line --

Case 1:01-cv-00181   Document 23   Filed in TXSD on 11/14/2001   Page 77 of 156

1          THE COURT:  Can we -- can we read this back?

2          MR. CHANEY:  Well, maybe I'm --

3          THE COURT:  Maybe we better play this back.

4          MR. CHANEY:  I may be confused.  And if I am,

5  I -- I apologize.  The difference is he's saying sole

6  cause, and I'm saying --

7          THE COURT:  So did you.

8          MR. CHANEY:  I'm saying a cause.  Then I

9  misspoke, and I apologize, Your Honor.

10          In my -- in my example, all I would have to

11  say is for indemnity, it was the sole cause because,

12  otherwise, I wouldn't be entitled to indemnity.  But for

13  contribution, the drunk driver was a cause, and that's

14  what I would say in any case, even though the plaintiffs

15  didn't bring direct action against the third party

16  because what he's trying to convince you of is once the

17  plaintiffs say, we don't want to sue that defendant, my

18  right to maintain a cross action is gone.

19          And I will be happy to provide the court with

20  some briefing to show that under Texas law, that is not

21  the case.  He's trying to tell you that all the

22  plaintiff has to do is say, hey, I'm not going to sue

23  this defendant anymore, and a codefendant can't continue

24  to maintain a cross action.  And I'm saying that that is

25  not the law in Texas, and I would be happy to find --

```
 1              THE COURT:  Have you sued -- have you sued --
 2    I misunderstood your suit.  You have sued these
 3    codefendants.  In fact, you've sued all codefendants?
 4              MR. CHANEY:  Yes.  Yes, Your Honor.
 5              THE COURT:  For contributory?
 6              MR. CHANEY:  No, for --
 7              THE COURT:  Contribution?
 8              MR. CHANEY:  For contribution and indemnity,
 9    yes, Your Honor.  In fact, almost every defendant has
10    sued almost every defendant in the context of the
11    asbestos cases.  Some of the standing orders, for
12    example, the Nueces County --
13              THE COURT:  Wait a minute.  If you get for
14    contribution is this, if you are sued, okay, and you're
15    just the only defendant left --
16              MR. CHANEY:  Right.
17              THE COURT:  And they're going to sue you as
18    the sole cause or a cause?
19              MR. CHANEY:  Yes, Your Honor.
20              THE COURT:  You -- that's the only two ways
21    you can be sued; right, sole cause or a contributing
22    cause?
23              MR. CHANEY:  They're -- in this case they're
24    saying we manufactured a product that was defective, and
25    that was the producing cause is what they say in
```

Case 1:01-cv-00181   Document 23   Filed in TXSD on 11/14/2001   Page 79 of 156

1      products, yes.

2                  THE COURT:   The producing cause?

3                  MR. CHANEY:   Yes.   And for negligence, it

4      would be proximate cause, but it's in essence the same

5      thing.

6                  THE COURT:   Well, isn't there a difference in

7      the contributions between a producing cause and a

8      negligence proximate cause?

9                  MR. CHANEY:   There's not really a difference

10     in my ability to share the responsibility with the third

11     party, but the proof that the plaintiffs have to put on

12     to a product manufacturer for a defective product is

13     producing cause, which is defined just a little bit

14     different in the pattern jury charge than proximate

15     cause.

16                 THE COURT:   Okay.   I guess I want to talk

17     about -- you're suing them for both producing and -- and

18     negligence?

19                 MR. SIEGEL:   That's right, Your Honor.   Yes.

20                 THE COURT:   Okay.   In -- in a producing cause,

21     if the jury finds that you're a producing cause and

22     awards $10 in damages, how would you ever get

23     indemnification from the other -- from the codefendant?

24                 MR. CHANEY:   Well, what I would typically do

25     is I would have the codefendant as a blank on the list

Case 1:01-cv-00181   Document 23   Filed in TXSD on 11/14/2001   Page 80 of 156

1   of persons with whom the -- or among whom the jury can

2   apportion the cause.

3            THE COURT:  But you can have 100 producing

4   causes.  In a -- in a products liability, do you have to

5   do apportion, like ten percent, this one, five percent,

6   that one?

7            MR. CHANEY:  Yes, you do.

8            THE COURT:  Is that -- is that right?

9            MR. SIEGEL:  Yes.

10           THE COURT:  Okay.

11           MR. CHANEY:  In fact, when you have mixed

12  products in negligence, you still apportion the same way

13  among everyone who may have contributed to cause the

14  injury or accident.

15           THE COURT:  And this person would not be --

16  this debtor would not be on the jury charge?

17           MR. SIEGEL:  There's a separate provision of

18  the Texas Civil Practice and Remedies Code that keeps --

19  that does allow, in some situations, bankruptcies to

20  come along if they settle with the plaintiffs or -- or

21  that's the position to be taken by defendant.

22  Otherwise, if it's just a bankrupt entity, that -- that

23  entity can't come on forms to begin with.  But

24  certainly, when there can't be any possible

25  responsibility for contribution because there's no

Case 1:01-cv-00181   Document 23   Filed in TXSD on 11/14/2001   Page 81 of 156

1    longer a viable contribution worry, they don't belong

2    there.

3              And, Your Honor, I really -- I asked my

4    associate to go look for a case.  Apparently, she

5    couldn't find it or she could not get to the library.

6    The case is C&H Nationwide versus Thompson in the recent

7    Supreme Court of Texas case from the mid '90s, and

8    it's -- I'm sorry I don't have the cite for you.  But it

9    says, almost verbatim, a -- a defendant or an entity

10   cannot be liable to a defendant if he is also not liable

11   to the plaintiff.

12             That is the simple bedrock law is that is what

13   contribution and indemnity is.  If there is no longer a

14   viable claim against Flexitallic for any of these

15   debtors, then there is no longer a proof of claim.  And

16   Your Honor's suspicions were right, I think.  All of a

17   sudden, these -- these proofs of claim are so important,

18   or these contributions claims are so important, yet they

19   never once even filed a proof of claim in any bankruptcy

20   in history for contribution.

21             MR. CHANEY:  Your Honor, I would be happy to

22   provide the case law that would show that I can maintain

23   a cause of action against a third-party defendant

24   irrespective -- I don't know about the case he's talking

25   about.  If there is an absolute defense by a third-party

Case 1:01-cv-00181  Document 23  Filed in TXSD on 11/14/2001  Page 82 of 156

1  defendant, like statute of limitations, that may have

2  some -- something in -- that may have an effect on my

3  ability to maintain them as a third-party defendant.

4       But I can easily find case law, Your Honor,

5  that says just because the plaintiff says I'm not going

6  to sue this defendant does not affect my right as a

7  defendant to bring in and maintain a claim for

8  contribution against that third-party defendant.

9       MR. SIEGEL:  It's not that we're not going to

10  sue them.  It's that we can no longer recover against

11  them.  If we just had never named Flexitallic and had

12  never sued them or dismissed them or nonsuited them,

13  then, yes, he would have a third-party claim against

14  them.

15       MR. CHANEY:  Well, did I --

16       MR. SIEGEL:  But now, by virtue of what I've

17  said, there is no rightful recovery on our part against

18  the debtor.  Therefore, there is no contribution claim

19  against the debtor.

20       MR. CHANEY:  I -- I guess I'm confused as to

21  what he's saying.  Even though he's dismissed them, I

22  still can -- I don't have it in front of me, Your

23  Honor.  But I can provide the court with -- with case

24  law that would say, I'm still able to maintain a cause

25  of action to try to get some fault apportioned to them

 1    because the -- one of the determinations that is

 2    extraordinarily important, Your Honor, is whether or not

 3    my client is jointly and severally liable.

 4             So you want to get anyone who has contributed

 5    to the -- to cause the disease on the jury form so that

 6    the jury can determine if that entity did, in fact,

 7    contribute to or cause the disease.  And in every one of

 8    these cases, one of the debtors had been identified by

 9    the plaintiffs themselves as having manufactured

10    products who caused his or her disease.

11             In the case law about my being able to

12    maintain the cause of action, Your Honor, I'd be happy

13    to provide you if -- if I have a day or so.  But I know

14    you want to talk to the bankruptcy lawyer some more.

15    I -- I'd be happy to answer any other questions you

16    have.

17             THE COURT:  Thank you.

18             MR. CHANEY:  All right.

19             MR. SIMON:  Good afternoon, Your Honor.  I'm

20    Henry Simon.  I'm a bankruptcy lawyer.  I don't know how

21    to improve the Texas practice system, but it seems to me

22    this -- the issues that we're dealing with today deal

23    with bankruptcy.

24             THE COURT:  Bankruptcy only.

25             MR. SIMON:  And the questions are these:

1    Should the court, as Mr. Jordan has said, without

2    hearing, without consideration, without laying

3    considerations or equities, simply send this case a --

4    as we say in your brief, to send this case to Delaware.

5    And the answer to that, obviously, is no.  It might be

6    comforting to Mr. Jordan or others, certainly to some of

7    these defendants who gain benefit of that, but the truth

8    is that the statutes which pertain to remand, which call

9    upon the court to examine the jurisdiction first,

10   actually makes sense.

11            It makes sense.  And every now and then when

12   you have to go back and read them all together, you

13   recognize that they make sense.  The court examines its

14   jurisdiction first, as our brief indicates the supreme

15   court has said, and I don't think it's controversial

16   but --

17            THE COURT:  That sounds familiar.

18            MR. SIMON:  Yeah.  And these are jurisdiction

19   issues.  The first question is whether or not this is

20   core or noncore.  Now, that wasn't part of the law for a

21   long time.  There is always a habit of bankruptcy

22   lawyers to say too much and give too much history, but,

23   just briefly, when the bankruptcy code came in, there

24   was this thought in the bankruptcy court one could do

25   anything.  One could get divorced; one could file any

1    kind of case.  And then came Marathon, and then came

2    limitations on the jurisdiction of the bankruptcy

3    court.

4              And then came these various concepts about

5    what the bankruptcy court could do and should do and

6    could not do and should not do.  And along with that

7    came with issue of whether or not a particular piece of

8    litigation was core or noncore.  This is noncore.

9    Everybody agrees it's noncore.  Well, if it's noncore,

10   then what jurisdiction is it?  The first thing the court

11   considers is whether or not it is related.  Is this

12   related jurisdiction?

13             Under 157C1 what is related jurisdiction?

14   Actually, the courts are split.  The statute says they

15   can have a material effect, even though it doesn't use

16   the word material.  Some courts say, you got to show me

17   it really makes a difference.  That's what I think

18   related means.  And other courts say, well --

19             THE COURT:  You're saying I don't have it yet

20   anyway.

21             MR. SIMON:  You don't have it.  There's no

22   related jurisdiction here.  This is a contribution

23   claim.  It's not entitled to a jury trial.  I don't know

24   what the affect is of the Texas jury charge and whatever

25   activity, but no one's giving up any claim.

Case 1:01-cv-00181   Document 23   Filed in TXSD on 11/14/2001   Page 86 of 156

1          What happens is people who have a contribution

2     claim, if they had it filed as a proof of claim to

3     bankruptcy, bankruptcy intervenes over a lot of this.

4     It's inconvenient to a lot of people.  It's -- it's a

5     discomfort, but it's been the law since the 18th

6     Century.

7               THE COURT:  But you love it.

8               MR. SIMON:  Well, I have -- I have to make a

9     living some way, Judge.  And I'm not very mechanical

10    so -- yes, I do.

11         So the question at first instance is what did

12    they really have?  Well, they don't have an indemnity

13    claim.  They claim to have a contribution claim because,

14    I guess, if they had an indemnity claim, the plaintiff

15    wouldn't have had any exposure to their products at all

16    or whatever.

17         But they claim to have a contribution claim,

18    and here's -- here's a good deal of law on that.  The

19    FDIC versus Sexton, .42, federal rules 55, simply says

20    you don't get a jury trial, and this isn't to delay the

21    jurisdiction.  And -- and there are lots and lots of

22    cases.

23         But the issue Defendant Jordan raises, which I

24    think is unique -- Mr. Jordan says two things that are

25    unique.  He says, first of all, you shouldn't even think

Case 1:01-cv-00181   Document 23   Filed in TXSD on 11/14/2001   Page 87 of 156

1    about these things.  You're not thinking about these;

2    just send them to Delaware.  And the reason that you're

3    just to send them to Delaware is this had a lot of

4    parts.  There's going to be 300,000 jury cases.

5              THE COURT:  But in case I wanted him to put a

6    little order there showing me how another judge has done

7    the same thing.

8              MR. SIMON:  I beg your pardon?

9              THE COURT:  Did you see their exhibits?

10             MR. SIMON:  I did not, Your Honor.

11             THE COURT:  You didn't show them your

12   exhibits -- those exhibits, did you?

13             MR. JORDAN:  Your Honor, there's a lot of

14   exhibits I haven't seen.  You can't imagine the

15   hurricane we've been undergoing in the last --

16             THE COURT:  Well, you don't think I've seen

17   the same hurricane?

18             MR. JORDAN:   Yes, you've seen it.  Yes, you

19   have.

20             MR. SIMON:  But, Your Honor, the point is

21   there won't be 300,000 jury cases that are -- that are

22   laid out to the Delaware court against the debtor in

23   bankruptcy.  That's why people file bankruptcies.  They

24   file bankruptcies, and they file a case on them.  And

25   they say to the bankruptcy judge, don't put us through

1  all these jury cases.  We don't have the money.  We're

2  tired of paying these lawyers.  Don't give anybody

3  relief from the automatic stay.  And, of course, without

4  relief from the automatic stay, you can't go forward;

5  can't go forward anyway.

6         And what they say is we're going to work this

7  out in the claims process.  These cases don't get

8  tracked to juries.  And Johns-Manville, Babcock &

9  Wilcox, Owens-Corning, they get worked out in the claims

10  process.  A certain amount of the debtors' assets are

11  put in what we call the defense program.  The assets get

12  put in a pool, and you let everybody who complained to

13  be in that pool fight among themselves for the assets.

14         The unsecured creditors submitting in these

15  major cases has belaboring work to make a determination

16  as to how much of the pool goes to people who have

17  coughs, pleural thickening; how much goes to people who

18  have cancer, or how much goes to living mesotheliomas,

19  and how much goes to dead mesotheliomas, and so forth.

20  Sometimes the process goes through, and sometimes it

21  doesn't.  But it doesn't go to jury trial.  So just take

22  that off.  That's not what happens.  It does not go to

23  jury trials now.

24         THE COURT:  You're saying it can't or it

25  doesn't?

Case 1:01-cv-00181  Document 23  Filed in TXSD on 11/14/2001  Page 89 of 156

1          MR. SIMON: The bankruptcy judge is faced with

2     the fact that the entire purpose of putting this case in

3     bankruptcy is to stop the litigation against this

4     defendant. And congress has said not only that you can

5     do that, but we're going to help you. The congress

6     passed 11-USC-524-G, which gives you the channeling

7     injunction if you give up sufficiency of your assets.

8     If you meet the test, then you put it in the pool, that

9     which the congress has said to be sufficient to relieve

10    you of asbestos liabilities.

11             That's what all these cases are all about.

12    That's what they're trying to get to. The statute

13    didn't exist at the time of Johns-Manville. The

14    Johns-Manville, although it was carefully negotiated,

15    stayed on with that form because they couldn't channel

16    it off. They can now, and that's where these bankruptcy

17    cases go. So they do not -- repeat, do not go to

18    multiple jury trials in that courtroom.

19             So that's just -- that horror doesn't exist.

20    Now, that's fine. Now, let's see where we really are.

21    We're really in the United States Federal Court in

22    Corpus Christi. This case has been removed here. There

23    isn't very much, if any, related jurisdiction. Maybe

24    they have a contribution claim. They've never raised

25    one. Raised is not the right word. They've never

Case 1:01-cv-00181   Document 23   Filed in TXSD on 11/14/2001   Page 90 of 156

1   pursued it.  They've never recovered on it.  But if they

2   do, they will file a claim in the bankruptcy.  So they

3   haven't lost their contribution claim.

4           Now, is it as effective as being able to try

5   it through a jury?  I don't know.  But lots of things

6   have circumvented by the bankruptcy process.  The

7   congress has provided a remedy for all of these folks

8   concerned.  They may not like the remedy.  Most of the

9   contractual creditors, as well as the noncontractual

10  creditors and debtors, don't like what happens to them

11  in bankruptcy.  But that's the system, so to speak.

12          The court also considers mandatory

13  abstention.  If there is no other jurisdiction, other

14  than that afforded by 28-USC-1340 -- 1334, if, in fact,

15  there is a pending state court case, and there is, if it

16  can be timely adjudicated, and it can, and if there are

17  not otherwise inequities, the Court should have a

18  saying.

19          Permissive jurisdiction picks it up if you

20  don't meet 100 percent of every test for mandatory

21  extension.  And permissive abstention really covers

22  what's fair to these parties.  You know, is it fair to

23  jerk them up to Delaware and they'll spend months up

24  there in a process where no one understands why they've

25  been sent there?  Of course not.

1          And, finally, to make it clearer what congress

2    intended, they came back with a special bankruptcy

3    remand provision, which is 1452.  It simply says, this

4    court can remand for any equitable reason, and that

5    there is no appeal from a remand for any equitable

6    reason.  So that's what we're really talking about.

7          Mr. Jordan would believe or would have us

8    believe that it should just be sent to Delaware for no

9    rhyme or reason and -- and months later, Delaware court

10   will do something with it maybe.

11          THE COURT:  Well, he's good, though?

12          MR. SIMON:  Yes, he is.  It's a very nice

13   argument, you know.  But for the argument regarding

14   transfer, I wouldn't be here.  So I guess I'm glad that

15   we have this.  But, I mean, this is a run-of-the-mill

16   personal injury case in which a defendant took

17   bankruptcy.  It happens every day, all over.

18          The argument regarding mandatory transfer is

19   unique in my experience.  It's not unique that there is

20   a consideration given to whether you consider

21   jurisdiction first.  You not only have the two supreme

22   court cases, but you have the Oklahoma case, and

23   that's -- and it's the case in which he says, yes, you

24   must consider jurisdiction first.  Transfer follows

25   jurisdiction.

1          If there is jurisdiction, if there is federal

2     court jurisdiction, then you can consider whether or not

3     to transfer.  But you certainly can't do it before

4     that.  But you do not engraft, that is you don't take

5     1412, which talks about interest of justice and forum

6     non-conveniens and match up 1412 with this

7     28-USC-157(B)(5) and say, aha, we've matched these two

8     up, and they don't really say what I think they say.

9     But think how nice it would be, Judge, if you just

10    transferred every one of these cases to Delaware.  Well,

11    it's a good argument.  It's an interesting argument, but

12    it's wrong.

13          You could amend the statute and then leave it

14    to congress to really consider at a point sending

15    absolutely everything to the bankruptcy court.  But they

16    thought they were right, and they decided to let the

17    decision, as to whether or not to assert or maintain and

18    continue federal court jurisdiction, remain at the local

19    level with the local United States district court who

20    understands this case far better than any Delaware court

21    ever would, to go down the liberty and find out whether

22    it related to the jurisdiction since it's noncore,

23    whether they say mandatorily or permissively, and most

24    of all, whether to remand on equitable grounds.  It just

25    seems to me that's what --

Case 1:01-cv-00181   Document 23   Filed in TXSD on 11/14/2001   Page 93 of 156

1          THE COURT:  Well, can I sever and remand?

2          MR. SIMON:  Oh, sure.  Absolutely.

3          Plaintiff sever -- or can sever and remand?

4  Certainly.  Certainly the debtor defendant is not going

5  to complain at being severed and there being a dismissal

6  and a dismissal with prejudice.  I mean, of course, they

7  can't complain.

8          THE COURT:  They are.

9          MR. SIMON:  No.  I know they're complaining,

10  not the debtor defendant.

11          THE COURT:  Oh.

12          MR. SIMON:  They're attempting to arguing.

13  This is -- you see, they're trying to say, well, the

14  automatic stay prohibits you -- prohibits you from doing

15  that.  It's -- it's already every day, and it's usually

16  wrong.  You can't claim the automatic stay if you're not

17  a debtor.  Nondebtors can't claim the automatic stay.

18  They can't come in and say, aha, you can't dismiss

19  against this debtor.  The debtor can claim.  The debtor

20  is the only party that --

21          THE COURT:  The automatic stay is only for the

22  benefit of the debtor.

23          MR. SIMON:  Absolutely.  352 is absolutely

24  explicit.  Only the debtor can claim.  The debtors waive

25  it.  The debtor cannot claim it, which is a little less

1   than waiver, and both courts will accept it.  Or on

2   motion and hearing, the court can grant relief.  But

3   nobody else can say, aha, there's a debtor, and he can't

4   do this because the debtor has the -- has the right in

5   automatic stay.

6           So at the end of the day, Judge Burris said,

7   and some of the other cases said, when you get through

8   one of these complicated assertions, in a strange way

9   there is -- there's less here than meets the eye.  This

10  is a personal injury case.  There's -- there's a

11  defendant in bankruptcy; get a lawyer.

12          I would be happy to answer any question I can

13  answer.

14          THE COURT:  Mr. Jordan.

15          MR. JORDAN:  Your Honor, I have to issue with

16  practically every summary we will all -- it was just

17  announced to you.  And I -- and I really want to start

18  from the beginning.  I need to get a copy of their

19  response this morning, and I could have it by five

20  o'clock, our response, to give you the case law that

21  says that what they're telling you is not case law.

22          Let me start with the first thing related to

23  jurisdiction.  Clearly, it's related to jurisdiction.

24  If this certain in re:  Wood, it says that anything,

25  they could have a conceivable --

1          THE COURT:  You can move on to the next one.

2          MR. JORDAN:  The second is what this Court can

3    do under 157(B)(5).  What is this Court permitted to do

4    by way of handling where the -- where this is tried.

5    The district court shall order the personal injury

6    toward the wrongful death claims.  It doesn't say those

7    asserted against the debtor.  It could include

8    contribution claims.  You'd have to have your personal

9    injury law in that trial, shall we arrive in the

10   district court in which the bankruptcy case is pending

11   or the district court in the district in which the claim

12   arose, as determined by the district court in which the

13   bankruptcy case is pending.

14          And now all the arguments that you've heard;

15   for instance, what counsel told you is, oh, none of

16   these proofs of claims that they've always filed until

17   their announcement this morning that they're not going

18   to file them.  All these claims never go to jury trial

19   28-USC-1411 specifically says that jury trial is

20   reserved.  In every single claim that is a jury trial is

21   reserved so that they --

22          THE COURT:  I was reading between the lines on

23   that one and figured that out.

24          MR. JORDAN:  Let me move --

25          THE COURT:  Just because it doesn't happen,

1    doesn't mean it can't.

2              MR. JORDAN:  We'll move to the next thing.

3    Counsel told you you can abstain.  You have plenty of

4    jurisdiction to abstain.  Anything you do to determine

5    where the case is to be tried in -- I respectfully

6    submit, is in --

7              THE COURT:  If this helps your arguments,

8    these are the only two options that I foresee at this

9    time:  Send everything Delaware, sever, and send the

10   remaining claims against the debtor to Delaware, and

11   remand the other -- the other claims.  Those are the

12   only two options, which don't really touch on abstention

13   and some other -- and some other things.

14             MR. JORDAN:  And do exactly what -- there is a

15   certain option that they offer today as to nonsuit, and

16   then do something.  And I'm not sure what that would

17   leave the court, but let me suggest this.

18             THE COURT:  Nonsuit.

19             MR. JORDAN:  Well, I believe they said they

20   were going to nonsuit or dismiss with prejudice.  I call

21   it nonsuit.

22             THE COURT:  No, I'll put that in an order that

23   that's been -- that that has occurred and that

24   representation is binding.

25             MR. JORDAN:  And here's the concern I have.

HEARING

1    First of all, Judge, 175, it restricts court to which --

2    in home to determine where any of these claims should be

3    tried.  And -- and you were -- several things announced

4    you today, as if you were the home court, and of course

5    you wouldn't know what's happening in Delaware.  What is

6    happening with the bankruptcy case, I don't know that.

7    I mean, I'm going to make an argument, I don't know

8    that.

9             THE COURT:  I understand that.  I understand

10    that.

11             MR. JORDAN:  And 157 is used to send all cases

12    to a single forum to --

13             THE COURT:  All cases involving the debtor.

14    But I can certainly carve out the debtor portion of this

15    case and send it to Delaware.  I've done it in the past.

16             MR. JORDAN:  Well, and I --

17             THE COURT:  And nobody's ever complained.

18             MR. JORDAN:  Well, and I guess that's the next

19    focus that I'd like the court to consider.  We told you

20    why we're here, and that is because plans have changed.

21    Yes, we're -- but -- but because it is changed, Garlock

22    is not one of the big players.

23             Garlock is now -- now in the category of

24    midsize players who will themselves be totally bankrupt

25    in the next couple of years, if this continues.  If what

1   is -- if what is allowed happens, the plaintiffs can

2   carve off each segment and retry and retry and retry the

3   same thing over and over again.  Then the defendants are

4   actually worn out.

5           And -- and, for instance, the suggestion to

6   you that you can abstain -- and this is one of the

7   reasons I would make this suggestion to the court.  What

8   I -- what I think the court needs to rule on on the

9   transfer motion is a matter of law is whether we

10  convince you by case law, by facts that are not

11  disputed.  I want the opportunity to respond to the

12  brief they filed today because I need to tell the court,

13  I don't believe it's accurate.  And -- and let me give

14  you just a very brief example, they had asked you to

15  have said.

16          157(B)(4) says, noncore proceedings under

17  157(B)(2)(B) 20 USC, shall not be subject to mandatory

18  abstention.  And you have to go read over what those

19  are, and those are any claims that deal with continued

20  or unliquidated personal injury or wrongful death tort

21  claims.  That's what each codefendant has in respect to

22  its right to contribution.  You can't -- there is no

23  mandatory abstention.

24          So I need the opportunity to put before the

25  court as a matter of law, I'm -- I am comfortable

1    standing on my briefs because I think the law is --

2    because this is a matter of -- because it's a matter of

3    law for you to -- for you to consider.  But I -- and

4    I -- and I truly need the opportunity to respond to

5    things that were suggested that -- that this court has

6    the jurisdiction to set the -- because what they're

7    asking you to do is --

8              THE COURT:  So you don't have a nonsuit with

9    prejudice.  They dismissed with prejudice.

10             MR. JORDAN:  We still have a counterclaim

11   simply --

12             THE COURT:  You don't have -- you don't have

13   an indemnification claim.  You only have a contribution

14   claim.

15             MR. JORDAN:  I think that's right.

16             THE COURT:  Is that what you're saying?

17             MR. JORDAN:  Yes, we have it, but we -- and I

18   say it this way, how -- I don't know how the court would

19   accomplish this type of severance.  Each codefendant has

20   a claim against the other, but I'm going to take one

21   unit and put it over here.  And that severed claim is

22   going to have one plaintiff and how many codefendants?

23   I mean certainly you wouldn't try to contribute twice.

24   And so --

25             THE COURT:  Am I right in assuming that none

1    of the other defendants -- none of the other defendants

2    joined in your -- in your removal over here?

3             MR. JORDAN:  I think -- well, you're right.

4    None did because the statute doesn't require a joinder

5    in these matters, and so none of --

6             THE COURT:  But I've not heard from -- I've

7    not heard from any of the other defendants.  See, I -- I

8    don't have any of their pleadings because you didn't

9    include any in the live pleadings.

10            MR. JORDAN:  I don't -- that doesn't make

11   sense.  I hope the Court --

12            THE COURT:  It doesn't make even the

13   remotest --

14            MR. JORDAN:  I hope that you just didn't get

15   all the file.

16            THE COURT:  Oh, no.

17            MR. JORDAN:  Because I -- we labored to hours

18   in the night to get these done right.  And I -- I just

19   don't understand that you wouldn't have --

20            THE COURT:  I don't have any answers from any

21   of the -- I have one answer in all of these in there

22   from your client.  I don't have any answers or cross

23   actions from any of the defendants.  So I have to assume

24   from that, since you are standing on your briefs and

25   your record, that there are no other cross claims by any

HEARING

1    other defendants against this -- this defendant.

2              So we're only talking about yours and holding

3    out the litigation because that was your obligation to

4    do an appropriate notice of removal, which I think is

5    probably the worst one I've seen, but who am I to say.

6              MR. JORDAN:  Well, and, you know, I'll stand

7    here and take that.  I do.  That's what happens.  I -- I

8    apologize.

9              THE COURT:  It's bad.

10             MR. JORDAN:  That's not our standard work

11   file --

12             THE COURT:  The file's right here.  Look

13   through it.

14             MR. JORDAN:  Yeah, I will.  I will have my

15   staff explain what happened too.  I don't understand

16   this.  So I -- I just have to tell you, we believe

17   without ever --

18             THE COURT:  So I'm assuming from that, and --

19   and I'm certainly in a position to assume from that,

20   that no other codefendant has a claim against this

21   debtor.  You're the only one, and I cannot imagine

22   holding that litigation with how many defendants are

23   there?

24             MR. CHANEY:  There are varying numbers of

25   defendants left in the nine cases, Your Honor.

Case 1:01-cv-00181   Document 23   Filed in TXSD on 11/14/2001   Page 102 of 156

1          THE COURT:  It looks like about 100 or so.

2          MR. CHANEY:  No, no.  It's usually 20, 25.

3          MR. JORDAN:  Yeah, 25 or 30.

4          THE COURT:  I'm just going to end up with the

5     service list.  It just seemed to go on and on and on.

6     And I had to read through it several times to look for

7     this debtor.  And six of them, the debtor wasn't even

8     mentioned.

9          MR. CHANEY:  So did we.

10          THE COURT:  No debtor in six of the cases

11     whatsoever; no mention of this debtor in six of the

12     cases that were remanded -- removed.  Three only had an

13     indemnification claim by your client.  So there is no

14     motion to supplement the record.  So I'm not going to

15     let you supplement the record on that issue.  That's the

16     way it is.  It is the way it is at this moment, the

17     removal.  So I will let you supplement it on -- are you

18     going to respond to the motion to remand?

19          MR. JORDAN:  Yes, I saw it this morning and --

20          THE COURT:  You may respond.  How much time do

21     you need?  I mean, this is your emergency motion.  So I

22     said immediately.

23          MR. CHANEY:  Your Honor, yes, and I -- I

24     didn't want -- I didn't ask earlier for a continuance.

25     I showed up because the other side asked me to.

1          THE COURT:  I understand that.

2          MR. CHANEY:  So if I can make a response to

3     the pleadings they filed today on my motion by tomorrow

4     morning at 9:00 o'clock, 9:30, and to the motion to

5     remand by, say, Thursday morning.

6          THE COURT:  All right.

7          MR. CHANEY:  Now, and on the remand, Your

8     Honor, that is -- I'd like to have the opportunity to

9     urge the Court to allow an additional hearing if you're

10    going to actually move to a remand after the other steps

11    are taken.  This is --

12         THE COURT:  Well, this is the hearing.  This

13    is the hearing.  If you have evidence, put it on.

14         MR. CHANEY:  Well, I didn't know it was a

15    hearing on the remand.  I mean, I didn't -- I didn't

16    know it was filed until this morning.

17         THE COURT:  Well, it's almost automatic, if

18    you're going to file a motion -- a mandatory motion to

19    transfer, we're going to be hearing about a remand.

20    Whether it's sua sponte -- this is whether it's

21    sua sponte, which I actually had signed this morning and

22    not entered -- not entered six remands in the nine cases

23    because of the very extremely-poor removal notices.

24         And I have to bring that up once again because

25    I sua sponte was going to remand six of them and was

Case 1:01-cv-00181   Document 23   Filed in TXSD on 11/14/2001   Page 104 of 156

1  almost going to remand all nine of them sua sponte.  But

2  I figured I'd let you talk because I may see them back

3  again for another defendant or somebody else because

4  it -- because of the 90-day rule.  But, I mean, that's

5  what I'm telling you is that -- is that it's not -- it

6  shouldn't be a surprise that we're going to take up a

7  remand because, well, we just didn't have a hearing

8  today.

9            MR. CHANEY:  Because I anticipate it, it's

10  just that I -- that we didn't -- I didn't have the

11  pleadings even as of today.  We called last Friday and

12  we called up last Thursday expecting to hear something,

13  and I just haven't heard from counsel at all, except to

14  continue.  That's the point I'm making is counsel called

15  me --

16            THE COURT:  Oh, he called the case manager and

17  I said not -- tell him no continuance.

18            MR. CHANEY:  So if the court would add me for

19  Thursday morning on the -- on the remand --

20            THE COURT:  But what evidence did you want

21  to -- what further evidence do you need on that?

22            MR. CHANEY:  Well, I haven't studied their

23  motion.  So I just want to be sure if what they raise

24  simply is a matter of law.

25            THE COURT:  Well, I have.

HEARING

1      MR. CHANEY:  Okay.  Well, if they've since

2  raised issues as a matter of law, then I can -- then I

3  can -- then I doubt seriously we'll have any evidence.

4  And if we have any evidence, it will probably be simply

5  by affidavit, and that can be done by Thursday.

6      THE COURT:  The only thing I'd like to hear is

7  that if you have -- there's an affidavit on file from

8  the plaintiff about the lack of any action by your

9  client against this debtor:  discovery, claims,

10  demands.  And if that is untrue, any part thereof, I

11  would like to see that in an affidavit.

12      MR. CHANEY:  All right.  And we'll -- we'll

13  respond to that, Your Honor.  I think what the affidavit

14  referred to is the historical conditions that the

15  industry was in, and I -- and I have -- I don't have if

16  that's accurate or not accurate.

17      THE COURT:  Well, your co-counsel there told

18  me, and according to the plaintiff, he misrepresented.

19  He told me there had been numerous amounts of discovery,

20  and that it was customary.  He didn't exactly say, but

21  it was on this point.  But that it was customary to use

22  this discovery in all of the cases, some 800 cases or

23  800,000, or however many there are.

24      And, in fact, plaintiff's counsel, and I

25  called this debtor's counsel and said, have you ever

1   done -- has this defendant ever done any discovery or

2   made any claim on -- for indemnification at all, any

3   demand, any Interrogatories, any depositions, and was

4   told, no, that it never occurred.

5        MR. CHANEY:  Your Honor, I will go through

6   these cases and -- and furnish any affidavit in response

7   to that.

8        THE COURT:  Is that all what you told me?

9        MR. SIEGEL:  That's what our affidavit says.

10  Mr. Simon from our office -- not this Simon, but

11  actually his son Jeffrey Simon, spoke to the chief

12  national counsel for the debtor.  And Mr. Simon recounts

13  in his affidavit exactly what was said.

14       THE COURT:  And I understand and I am going to

15  take this representation, unless I am told otherwise,

16  that the debtor does not object to being dismissed

17  without prejudice -- with prejudice?

18       MR. SIEGEL:  That's right.

19       THE COURT:  And the debtor does not object to

20  the plaintiffs' statement that they will not file any

21  proof of claims in the debtors' bankruptcy in Delaware.

22       MR. SIEGEL:  That's right.  And I say that in

23  certificate of conference on the motion for severance,

24  and that is exactly the case.

25       MR. CHANEY:  Your Honor, can I mention one

1   thing?  I want to make sure that my statement to you

2   that you understood or that I've -- I've made sure that

3   I clearly --

4          THE COURT:  It was a broad statement.

5          MR. CHANEY:  All I'm saying about the

6   discovery is you had asked me, did we take discovery

7   against, for example, Gasket Holdings, and because they

8   are one of the debtors and although it's, you know,

9   Federal-Mogul, it's all their subsidiaries also.

10         THE COURT:  Right.

11         MR. CHANEY:  So -- and what I meant by the

12   fact that we've probably been in thousands of cases, and

13   in many of those cases, representatives or experts of

14   these debtors have been taken.  So -- and it's common in

15   this docket for those to be used in various trials.  So

16   I -- we have not taken any discovery in these nine cases

17   against these defendants, but we have a lot of discovery

18   against those defendants that we have accumulated from

19   other cases.

20         So it wouldn't be necessary for me to go take

21   a deposition of a corporate representative of Gasket

22   Holdings because it's probably been taken several dozens

23   of times.  And that's the same for all the defendants.

24   That's what I --

25         THE COURT:  That's what I actually heard had

Case 1:01-cv-00181   Document 23   Filed in TXSD on 11/14/2001   Page 108 of 156

1    never happened.

2              MR. SIEGEL:  No.  Your Honor, it -- it's

3    certainly true that, for instance, in the -- in the

4    years of asbestos litigation, plaintiffs frequently may

5    have taken the deposition of a Flexitallic corporate

6    representative.  Defendants don't typically notice each

7    other's deposition.  In fact, I can't even think of an

8    instance that that's ever occurred.  And I'm certain

9    that it hasn't ever occurred between Garlock and

10   Flexitallic, or they would know it.

11             But it's certainly true that when we put on

12   our cases against Flexitallic in the years where they

13   weren't bankrupt, we're allowed to use depositions that

14   may have been taken in another case.  That -- that's

15   all.  What I think the point -- what we were trying to

16   demonstrate through our phone call to the debtor's

17   counsel is that they don't take -- they never have and

18   do not take these contribution claims seriously because

19   they've never crossed -- they've never once, for

20   instance, paid a judgment to a plaintiff and then gone

21   after money from Flexitallic.

22             Or they've never -- they've never rounded up

23   all the plaintiffs in a class action and said, we paid

24   these 100,000 people 100 billion dollars, and we're

25   suing you for half of it.  That -- that kind of thing

1    has never happened.  I think we have to recover

2    contributions that were --

3              MR. CHANEY:  I think, with that correction, I

4    agree.  But there's plenty of discovery out there that I

5    have access to from Flexitallic and Gasket Holdings.

6    And we've not probably taken their depositions, but it

7    would be superfluous for us to do that because we

8    probably have 50 depos from various of their experts or

9    representatives.  We haven't pursued the claims like

10   Mr. Siegel has, but I didn't want the court to think

11   that there's never been any discovery conducted as to

12   Flexitallic.  That's happened before.

13             And one other point, Your Honor, and I

14   apologize for the -- I apologize if these removals

15   didn't have all the pleadings in it.  We tried to make

16   sure and do that, but I don't know.  I think the Nueces

17   County standing order says -- and this is an effort that

18   occurs in various jurisdictions where the district

19   clerk, I think after a while, decides either I'm putting

20   a gun to my head, or we need some different rules

21   because there is a flurry of cross actions.

22             You know, we've probably taken a good chunk of

23   Brazil in filing this paper.  And what happens is that

24   the judges in certain of these venues, the Valley is

25   one; Nueces County is one, said every defendant has a

1    cross action against every other defendant without

2    filing it.  You are drowning our clerks in paperwork.

3    Don't file it --

4              THE COURT:  But then it leads to docket

5    entry.

6              MR. CHANEY:  It's in a separate standing order

7    for asbestos cases only.  Nevertheless --

8              THE COURT:  But wouldn't you have included

9    that in --

10             MR. CHANEY:  I'm -- I'm not suggesting that it

11   perhaps shouldn't have been included.  But all of these

12   defendants, if you -- if they were to speak up, would

13   say they have cross actions, either that they filed or

14   by virtue of the standing order, are filing against

15   these debtors.

16             MR. SIEGEL:  Actually, Your Honor, the

17   standing orders in Nueces County do not apply to Waters

18   & Kraus cases.  They apply to Baron & Budd cases.  And

19   that's another sort of peculiar fact that we can't

20   understand here.  Baron & Budd has many more cases than

21   we do.  They're governed by standing orders, but for

22   some reason, those cases weren't removed.

23             THE COURT:  Why is that?

24             MR. CHANEY:  Because we've got virtually in

25   the -- almost all of the plaintiffs' attorneys in the

Case 1:01-cv-00181   Document 23   Filed in TXSD on 11/14/2001   Page 111 of 156

```
 1    State of Texas, we have either arrangements or some type

 2    of agreements with, Your Honor.  This is the only --

 3              THE COURT:  What do you mean?

 4              MR. CHANEY:  I mean we -- we settle virtually

 5    every case that we have.

 6              THE COURT:  Oh, settle every case?

 7              MR. CHANEY:  With virtually every case that we

 8    have, for example, with the firm that he just mentioned.

 9              THE COURT:  You settled every case but this --

10    this law firm's case?

11              MR. CHANEY:  Well, I can't say every, Judge,

12    truthfully because I only -- I only handled South

13    Texas.  But the vast majority of all of the asbestos

14    litigation in Texas, as to my client, it settled either

15    by virtue of a standing settlement agreement or some

16    type of a global arrangement or some type of

17    understanding.

18              We don't need -- we don't need the type of

19    consolidation that we're asking for where we have cases

20    with firms that we have long-term standing orders and --

21    I mean settlement --

22              THE COURT:  Well, how long term was it, if

23    they're still on the docket?

24              MR. CHANEY:  Maybe I'm confused, Your Honor.

25              MR. SIEGEL:  With all due respect, Your Honor,
```

HEARING

1    are we being punished by means of the federal removal

2    statute for getting -- for not settling our --

3              THE COURT:  No.  No.  Are these -- I

4    understood these cases are still on the docket, the

5    state court docket.  And you're saying they've been

6    settled?

7              MR. CHANEY:  No, no.  I didn't mean to imply

8    that they're still on the docket.  If they've been

9    settled, they're not on the docket.

10             THE COURT:  Okay.

11             MR. CHANEY:  But we have an agreement.  For

12   example, he mentioned our --

13             THE COURT:  So every case that this -- the

14   jury and this other debtor is in, no matter the law firm

15   representing the plaintiff, has been removed to federal

16   court, if it's still there -- if it's still on the

17   docket?

18             MR. CHANEY:  Every case that -- well, every

19   case that I'm in -- and there are more than -- I'm not

20   the only lawyer who represents Garlock in the State of

21   Texas, to make sure that you understand.

22             THE COURT:  But you do in South Texas?

23             MR. CHANEY:  Yes.  In every case that I am in

24   with Mr. Siegel's firm, I believe every case has been

25   removed to federal court.

HEARING

1          THE COURT:  Well, I'm asking what about other

2     cases?  Are there any nonremoved cases that are still

3     pending?

4          MR. CHANEY:  Yes, there are, Your Honor.

5          THE COURT:  Where your client and the debtor

6     is in on --

7          MR. CHANEY:  Well, I don't know about my

8     client and the debtor.  Now, what has happened --

9          THE COURT:  Are you in other cases with the

10    debtor in South Texas?

11         MR. CHANEY:  I don't believe we are anymore

12    because what happened is once we removed the case, they

13    ran out virtually the very next day and nonsuited the

14    debtor in every case.

15         MR. SIEGEL:  That was not our firm.  It wasn't

16    our firm.

17         MR. CHANEY:  Oh, well, I don't -- I don't know

18    how many cases.

19         THE COURT:  I'm asking about --

20         MR. CHANEY:  But the honest truth is, I don't

21    know the answer to that, Your Honor, but I would be

22    willing to -- you know, within the time period of the --

23    the response to the motion of remand.

24         THE COURT:  Well, is it possible that you just

25    removed this law firm's cases?

1          MR. CHANEY:  We did.  Yes, that is what we

2     did, Your Honor.

3          THE COURT:  Well, why -- why not the other

4     cases?

5          MR. CHANEY:  Because what I was trying to tell

6     you -- what I was trying to tell the Court is, see,

7     the -- most of the cases, they're filed.  There is

8     discovery done, and the -- the way this docket is run,

9     once there is a certain amount of ID information

10    developed and a certain amount of information that shows

11    the status of the disease, then there are agreements

12    with the majority of the plaintiffs' firms in Texas and

13    my client where the cases are settled.  Those cases are

14    then settled, and they're taken off the docket.

15         THE COURT:  The cases that are still on the

16    docket in South Texas, they are not this law firm's

17    cases?

18         MR. CHANEY:  Yes, Your Honor.

19         THE COURT:  Were they not -- they were not

20    removed because?

21         MR. CHANEY:  Because we have understandings or

22    agreements with those other firms.

23         THE COURT:  So they're all settled.  There's

24    no nonsettled cases, other than these law Firms' cases?

25         MR. CHANEY:  Well, when you say settled, this

1    is -- I had -- I had some problems understanding this in

2    the asbestos docket when I got in it also.  The case

3    will be filed usually.  The plaintiffs then develop some

4    evidence about my client was exposed to your product,

5    and here's the medical record that shows he has this

6    disease.

7              At that point in time, what happens is in

8    the -- in the majority of the cases, there's an

9    agreement that results in that case being settled at

10   that time.  So they're not very -- very often they're

11   not settled pre lawsuit.  They're filed.  There is some

12   rudimentary discovery that has taken place, and then

13   they are settled.

14             THE COURT:  Okay.  So you're implying that

15   it's settled.  Every case has not been removed in South

16   Texas.

17             MR. CHANEY:  Well, or there's an -- or in the

18   majority of cases, there is an agreement in place that

19   will result in those cases being settled eventually.

20             THE COURT:  What do you mean?

21             MR. CHANEY:  Is what I was just trying to

22   explain.

23             THE COURT:  What -- what kind of agreement?

24             MR. CHANEY:  An agreement or understanding

25   between the law firm, whoever we might be talking about,

Case 1:01-cv-00181   Document 23   Filed in TXSD on 11/14/2001   Page 116 of 156

1    and -- and my client.

2              MALE VOICE:  Your Honor, it includes an

3    informal --

4              THE COURT:  You mean an informal kind of a

5    settlement, that's not settled?

6              MR. CHANEY:  Or there might be -- I don't

7    know, but there very well may be a written document that

8    existed.  I really don't get involved in that because I

9    do mainly the trial work.  But some of them may be

10   informal.  Some of them may be formal.

11             MALE VOICE:  And, Your Honor, up until -- up

12   until this year, that was the standard practice is that

13   you would -- you would take your X-rays, your reads;

14   your experts would fit into a matrix some place.

15   Everyone on the plaintiff's side knew where --

16             THE COURT:  When is the 90 -- when is the 90

17   days up for this?

18             MR. CHANEY:  For another seven days or so.

19             THE COURT:  Okay.

20             MR. CHANEY:  I mean, there's time -- let me

21   also say that one of the reasons that we picked this --

22   these -- these are the reasons --

23             THE COURT:  Well, why is the emergency on this

24   one and not on the others?

25             MR. CHANEY:  Because we think we'll settle.  I

1    mean, the others think they're -- if they're in the

2    file, I have one that will settle in the -- in the back

3    that you originally -- that we've been traditionally

4    doing.  These -- these different cases are no longer

5    traditional cases.  They don't settle.  They haven't

6    settled.  And the demands have become astronomical.

7           And I, again -- and I, again, apologize.  I

8    don't know what happened to this file, why you would not

9    have as complete a file as the others did.  I don't

10   understand that, and I'm -- I assume, if my staff should

11   explain that, what they got out of the clerk's office,

12   you got it.  You should have exactly what it is.  I

13   don't know what -- what went wrong, but I'll find out.

14           THE COURT:  And in some of them I have the

15   most bizarre documents; nothing relevant really.  I have

16   the plaintiff's original petition and -- and your

17   client's answers and cross action.  Those are the only

18   pleadings in any of the cases -- any of the nine cases.

19   I have bunches of Interrogatories, which you never file

20   in federal court.  Some miscellaneous, other documents,

21   extremely peculiar.  And, of course, again, there's --

22   six of the cases there's no mention of the debtor at

23   all.

24           MR. CHANEY:  And I -- you have to look at the

25   attachments to see.  You know, I -- I can't imagine the

```
 1    debtor's name isn't on the attached as a -- I don't

 2    know.  I can't explain it.  I'm going to find out how

 3    that could happen.

 4              THE COURT:  Pull out 478, for instance.

 5              MR. SIEGEL:  I think the reason --

 6              THE COURT:  You got 478?  Ms. Garza, you're

 7    the clerk, 478.  Would you give that to the marshal,

 8    please?

 9              MALE VOICE:  Yes, I'm sorry.

10              MR. CHANEY:  Your Honor, I -- if I can

11    enlighten the Court, what I -- what I see -- where I

12    see --

13              THE COURT:  Do you see that?

14              MR. CHANEY:  Well, the debtor's name, if

15    you'll notice, the first half lists every -- according

16    to the rules, lists every counsel, the defendant, the

17    addresses, the phone number, the fax number.  And if you

18    go down one, if you would not know -- and what I don't

19    see -- and I don't know --

20              THE COURT:  How could I possibly know?

21              MR. CHANEY:  How could you possibly know the

22    Gasket Holding Company is a defendant, and that we were

23    not committed to put Gasket Holdings in the headings

24    because Delaware --

25              THE COURT:  And where would it be in any
```

1   petition that you filed?

2           MR. CHANEY:  You mean any pleadings filed?

3           THE COURT:  Any pleadings.

4           MR. CHANEY:  Well, it should have been

5   disclosed in bold letters to show you that that is the

6   debtor by which we are claiming --

7           THE COURT:  Well, it wasn't.

8           MR. CHANEY:  Can I see your -- well, you --

9   you are supposed to have all live pleadings naming all

10  parties.

11          THE COURT:  And, of course, they're not

12  there.

13          MR. CHANEY:  Okay.  Well, here's United Gas --

14  Turner & Newell.  That's the one of the debtors that are

15  named.  Although, we don't -- it doesn't say that on

16  the --

17          THE COURT:  For all the defendants, how on

18  earth could I possibly know from the state of those

19  pleadings that you sent over?

20          MR. CHANEY:  You could not figure that out,

21  and I -- I mean, I have to agree with that.  I wanted

22  to -- I wanted to show the court what we thought we did

23  what we were supposed to, but you could not figure that

24  out without a -- without some sort of --

25          THE COURT:  Even your cross action doesn't

1    name them.

2           MR. CHANEY:  Well, again, I --

3           THE COURT:  It's not even in the style of the

4    pleadings.

5           MR. CHANEY:  And I thought this was a county

6    in which cross actions did not have to be filed or

7    they're being filed.

8           MR. JORDAN:  There is a cross action on file,

9    Your Honor, in all of --

10          THE COURT:  Well, how would I know that?

11          MR. JORDAN:  Well, I'm not saying that -- I

12   didn't prepare -- I'm not trying to distance myself

13   here, but I didn't prepare the rules on these cases.

14   You -- the cross action should have been enclosed.  It

15   should have been part of the --

16          THE COURT:  Well, it is.  It's part of your

17   answer.  It's a -- it's a state court answer that's got

18   an answer and a cross action.  It just says all

19   defendants.

20          MR. CHANEY:  You said Case Number 38.  Which

21   one --

22          THE COURT:  78 -- 478.  I was just using this

23   as an example of the ones where I couldn't find hide nor

24   hair of Federal-Mogul Global.

25          MR. CHANEY:  And the plaintiff's name, on the

1   whole second page, Your Honor, I don't have it.

2         THE COURT:  Arnold.

3         MR. CHANEY:  Arnold.

4         THE COURT:  And I have your answer that says,

5   motion to transfer venue; subject there to include as

6   your original answer, jury demand, and original cross

7   action, and it just says, we want to sue all

8   defendants.

9         MR. CHANEY:  That is -- I mean that is the

10  state form filed with the cross action.  I apologize if

11  it wasn't pointed out more or highlighted more for the

12  Court.

13        THE COURT:  Well, how could you possibly

14  highlight it any more?  It just says sue all

15  defendants.  And in some of these, you see, the

16  plaintiff had already taken a nonsuit.

17        MR. CHANEY:  I don't think the -- the

18  plaintiff in this case, the one that we're looking at,

19  the Arnold case, had taken a nonsuit against all of the

20  defendants that went in or all of the debtors that went

21  into bankruptcy.  I show that on the little information

22  that I have in this notebook, and we -- I brought the

23  state court pleadings with me, that Flexitallic was

24  ID'd, that Gasket Holding was in the case.

25        THE COURT:  Well, that -- that may be all

Case 1:01-cv-00181   Document 23   Filed in TXSD on 11/14/2001   Page 122 of 156

```
 1   wonderful.  But as the gentleman pointed out, the first

 2   thing I look to is jurisdiction, and I've got somebody

 3   removing a case based on a debtor that's not a party

 4   from the state to these pleadings.  And that's why I was

 5   sua sponte remanding them all.

 6            MR. CHANEY:  I understand what you're saying,

 7   Judge, but Gasket Holdings was a defendant, and it is --

 8   it's one of the debtors.

 9            THE COURT:  How would I know that?

10            MR. CHANEY:  I'm not saying -- Your Honor, I'm

11   not defending the state of the papers that came

12   forward.  I'm just telling the court that that's the

13   state it's reading.  And if it wasn't clear to Your --

14   to, Your Honor, I understand that, and I apologize.

15            MALE VOICE:  Your Honor, I recall being

16   attached to the order that consolidated Federal-Mogul

17   because the heading, it contained the header, it

18   attached the order that included all the defendants, all

19   the actual filed members under the consolidated numbers,

20   which made the T&N and the Gasket Holdings.

21            MR. CHANEY:  Your Honor, in Brownsville, if I

22   might add, the plaintiff did file a motion to remand.

23   And in that case, they said the debtor was not a party,

24   and we attached the Brownsville's case, the -- the

25   automatic stay order and the filing from the bankruptcy
```

1    court that clearly shows that although the Federal-Mogul

2    Gasket Holdings company, Flexitallic, all of the other

3    subsidiaries are parties also or debtors in that

4    bankruptcy.  If that pleading was not attached in these

5    removals, it should have been.  And I apologize for

6    that.

7              THE COURT:  There's really nothing relevant in

8    these pleadings, but -- and, in fact, a good number of

9    these nine cases had the citation issued to -- the three

10   cases that were -- that actually had a mention of

11   Federal-Mogul didn't even have a -- serve a citation on

12   them.

13             MR. CHANEY:  Federal-Mogul may not have in

14   several of those cases been sued, but in every one of

15   the cases, the -- a subsidiary was or I guess until

16   today, may announce the dismissal with prejudice was a

17   party at the time of the removal.

18             THE COURT:  All right.  Anything else?

19             MR. CHANEY:  Your Honor, I requested the --

20   the time to file responses, and if that would be

21   permitted by court?

22             THE COURT:  Any objection?

23             MR. SIEGEL:  No, Your Honor.  I -- I just want

24   to make sure I understand what is coming when.

25             THE COURT:  By Thursday morning they'll

1   respond to your motion to remand.  That is just one

2   defendant.

3              MR. SIEGEL:  I feel like we've stated our

4   arguments and don't necessarily need to.  And I agree --

5   and I don't -- and I guess we'll -- we'll waive the

6   right to file one.  We would like, Your Honor, to rule

7   expeditiously.  Needless to say, I have taken exception

8   to the notions that alone and with all plaintiffs,

9   asbestos firms, that we're being used because we don't

10  enter in a group settlement.

11             THE COURT:  We didn't get a straight answer on

12  that one, did we?  I'm just not clear at all because he

13  says -- you know, he says he comes in at trial time.  So

14  I'm not sure, you know, what state or the others that

15  well.

16             MR. CHANEY:  I'm trying to give a straight

17  answer -- and I apologize, Your Honor.  We have -- in

18  the majority of the cases, we have an agreement or

19  understanding with our counterparts with the firms like

20  Mr. Siegel's about the value of the cases.  The -- the

21  demands that we have received within the last year from

22  this firm are compared to the other cases.

23             And -- and many of the -- many of those

24  lawyers are very fine lawyers with a lot of experience

25  in this litigation.  Comparatively, the demands are

1   exorbitant.  And so we have in place agreements for

2   reasonable settlements with the vast majority of the

3   firms that do this kind of work on the plaintiffs' side

4   and have had for some number of years, Judge.

5              MR. SIEGEL:  Well, is that the reason

6   you're --

7              THE COURT:  Do you have enforceable agreements

8   with all -- in all the other cases?

9              MR. CHANEY:  Some -- some of them are

10  enforceable.

11             THE COURT:  Some are not?

12             MR. CHANEY:  Some of them just are -- are

13  understandings where we've never had problems.  We've

14  never had difficulties.

15             THE COURT:  Well, what if this firm

16  substitutes in and --

17             MR. CHANEY:  What firm substitutes in?

18             MR. SIEGEL:  Your Honor, they can try cases

19  against us if they don't like our demands.

20             MR. CHANEY:  We have tried very -- we've tried

21  many against them, and most of them have resulted in --

22             THE COURT:  Okay.  We're done.  Thank you all

23  very much.  Thank you very -- anybody else want to say

24  anything that's here on the case?

25             Thank you all very much for your appearances.

1    You're excused.

2              (Proceedings were concluded.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    STATE OF TEXAS          )

 2    COUNTY OF DALLAS        )

 3

 4            I, Dana A. Taylor, Certified Shorthand

 5    Reporter in and for the State of Texas, certify that the

 6    foregoing recorded hearing was transcribed by me and

 7    that the hearing is a true record to the best of my

 8    ability.

 9            I further certify that I am neither counsel

10    for nor related to any party in this cause and am not

11    financially interested in its outcome.

12            Given under my hand this the _____ day of

13    November, 2001.

14

15

16

17                    _____
                      Dana A. Taylor, CSR #6048
                      CSR Expiration:  12/31/02

18                    Henjum Goucher Reporting Services, P.C.
                      2501 Oak Lawn Avenue

19                    Suite 435
                      Dallas, Texas 75219

20                    (888) 656-DEPO

21

22

23

24

25
```

# EXHIBIT C

DONALD BEEZHOLD

```
 1              IN THE UNTIED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION
 3
     DEBRA KULAW, Individually and    *
 4   As Personal Representative ofthe*
     Heirs and Estate of             *
 5   LeVAUGHN DARNOLD,               *
                                     *CASE NO.
 6                                   *B-01-CV-178
                          Plaintiffs, *
 7                                   *
          -against-                  *
 8                                   *
     ACandS, Inc., et al.            *
 9                 Defendants.       *
10   ********************************************
                     ORAL DEPOSITION OF
11                   PAUL J. HANLY, JR.
                     NOVEMBER 02, 2001
12   ********************************************
13
                 DEPOSITION OF PAUL J. HANLY, JR.,
14
     taken on behalf of the Plaintiff, at 415.
15
     Madison Avenue, New York, New York 10017,
16
     commencing at 1:01 p.m., the 2nd day of
17
     November, 2001, before Danielle Grant,
18
     Notary Public in and for the State of
19
     New York.
20
21
22
23
24
25
```

DONALD BEEZHOLD

```
 1                    A P P E A R A N C E S
 2    FOR THE PLAINTIFFS:
            DAVID C. GREENSTONE, Esq., of Counsel
 3          WATERS & KRAUS, LLP
            3219 McKinney Avenue
 4          Suite 3000
            Dallas, Texas 75204
 5          214-357-6244
 6
      FOR THE DEFENDANTS CAPCO AND ASARCO:
 7          CHRISTOPER P. DePHILLIPS, Esq., of Counsel
            PORZIO, BROMBERG & NEWMAN, P.C.
 8          100 Southgate Parkway
            Morristown, New Jersey 07962-1997
 9          973-538-4006
10
      FOR THE DEFENDANTS GARLOCK:
11          BERNARD L. LEVINTHAL, Esq., of Counsel
            GOLDFEIN & HOSMER
12          1600 Market Street
            Philadelphia, Pennsylvania 19103-7288
13          215-979-8200
14
      FOR THE DEFENDANTS GARLOCK:
15          MICHAEL H. REED, Esq., of Counsel
            PEPPER & HAMILTON, LLP
16          3000 Two Logan Square
            Philadelphia, Pennsylvania 19103-2799
17          215-981-4000
18    FOR THE DEFENDANTS AMERICAN STANDARD:
            ROBERT BROOKS-RIGOLOSI, Esq., of Counsel
19          ROSS & HARDIES
            65 East 55th Street
20          New York, New York 10022
            212-418-0689
21
22
23
24
25
```

DONALD BEEZHOLD

```
 1    APPEARANCES...CONTINUED
 2
 3    FOR THE DEFENDANTS BORG-WARNER CORPS; BROWN &
      ROOT, INDIVIDUAL & AS SUCCESSOR IN INTEREST TO
 4    HARBISON WALKER; DRESSER INDIVIDUAL & AS SUCCESSOR
      IN INTEREST TO WORTHINGTON INC., and WORTHINGTON
 5    CORP.:
                ELIZABETH L. PHIFER, Esq., of Counsel
 6              GODWIN, WHITE, GRUBER, ESQS.
                901 Main Street, Suite 2500
 7              Dallas, Texas 75202-3727
                214-939-4826
 8
 9    FOR THE DEFENDANTS AMETEK, INC.:
                COLIN M. CHERICO, Esq., of Counsel
10              BAKER BOTTS, LLP
                599 Lexington Avenue
11              New York, New York 10022-6030
                212-705-7050
12
      FOR THE DEFENDANTS COMBUSTION ENGINEERING:
13              JOHN CESARO, Esq., of Counsel
                PICILLO & CARUSO
14              371 Franklin Avenue
                Nutley, New Jersey 07110
15              973-667-8100
16
      FOR THE WITNESS:
17              JAYNE CONROY, Esq., of Counsel
                COBLENCE & WARNER
18              415 Madison Avenue
                New York, New York 10017
19              212 593-8000
20
21
22
23
24
25
```

1                         INDEX
    WITNESS:  PAUL J. HANLY, JR.

2

    EXAMINATION BY                      PAGE
3   BY MR. GREENSTONE                     5
    BY MR. REED                          14
4   BY MR. LEVINTHAL                     19

5
                         EXHIBITS

6

    NUMBER           DESCRIPTION        PAGE
7     1          Fourth Amended Notice    6
      2          Affidavit and Subpoena   7

8
      G1            Informational brief   14
9     G2      Affidavit of David M. Sherbin  16

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    PAUL J. HANLY, JR.,
 2    having been first duly sworn, testified as
 3    follows:
 4                         EXAMINATION
 5    BY MR. GREENSTONE:
 6            Q    Good morning, sir.
 7            A    Good afternoon.
 8            Q    I guess it is afternoon.
 9                 Would you state your full name for
10    the record?
11            A    Paul J. Hanly Jr.
12            Q    I have a few questions to ask you,
13    sir, but before we sort of get into the meat of it
14    can you tell us how you are currently employed and
15    your association with Federal-Mogul and Gasket
16    Holdings Inc.?
17            A    I am an attorney.  I'm a partner of
18    this law firm, Coblence and Warner.  I have been
19    national counsel T&N Flexitallic and Forodo since
20    1981, with approximately a two-year hiatus in the
21    early 1990s.
22                 I have been national counsel to
23    Federal-Mogul Corporation and all of its
24    subsidiaries with asbestos liability since the
25    acquisition by Federal-Mogul Corporation since
```

DONALD BEEZHOLD

1    March of 1988 of T&N, Flexitallic and Forodo.

2           Q    What is the relationship of Gasket

3    Holdings, Inc. to these organizations?

4           A    Gasket Holdings Inc. is the current

5    name of a company that used to be known as

6    Flexitallic Gasket Company Inc., later known as

7    Flexitallic Inc., Gasket Holdings Inc., is a

8    wholly-owned subsidiary of Federal-Mogul

9    Corporation.

10          Q    I want to attach as Exhibit 1 to the

11   deposition Plaintiff's fourth amended notice of

12   intent to take oral deposition.

13               (Plaintiff's Fourth Amended Notice,

14          was marked as Plaintiff's Exhibit No. 1,

15          for identification, as of this date.)

16          Q    Sir, I believe you are also

17   appearing here pursuant to subpoena?

18          A    That's correct.

19          Q    I believe the subpoena is attached

20   to this affidavit here of a Mr. Jeffrey Simon who

21   works at my firm.

22               Are you familiar with Mr. Simon?

23          A    I have never met Mr. Simon but I

24   have spoken to him on the telephone.

25          Q    Okay.  Great.

DONALD BEEZHOLD

1          A     This Exhibit 1 does not have the
2     subpoena attached to it.
3          Q     Okay.  The subpoena we have, I'll
4     mark this as Exhibit 2, which is an affidavit of
5     Jeffrey Simon and it does have the subpoena
6     attached, as well as the First Notice of
7     Deposition we had given in this case.
8                         (Affidavit and Subpoena, was
9                    marked as Plaintiff's Exhibit No. 2, for
10                   identification, as of this date.)
11         A     I have Exhibit 2 in front of me.  I
12    have never seen this affidavit before.  Would you
13    like me to read it?
14         Q     Absolutely.  You can read it in its
15    entirety if you would like?
16         A     To myself?
17         Q     Yes.
18         A     I have read the affidavit which is
19    the first two pages of Exhibit 2.
20         Q     It's my understanding that that
21    affidavit was prepared by Mr. Jeffrey Simon after
22    a conversation with you on the telephone.
23               Do you remember having a
24    conversation with him on the telephone?
25         A     I do.

1        Q     My first question would be:  Is

2   there any item in the affidavit of Jeffrey Simon

3   that you take issue with or disagree with in any

4   manner?

5        A     No, except, first with respect to

6   paragraph number one it references that I have

7   served as national, chief national trial and

8   coordinating counsel in asbestos-related injury

9   and wrongful death claims for a number of

10  corporations, among those set forth in paragraph

11  one is Felpro Corporation.  I have not prior to

12  October 1, 2001 served in that capacity for Felpro

13  Corporation.  The remainder of paragraph one is

14  true however.

15            Paragraph six which reads "none of

16  the corporation that Mr. Hanly represents have

17  ever paid Garlock any money to either settlement

18  or judgment for any cross-claim claimed for

19  contribution or claimed for indemnity is true to

20  the best of my knowledge."  So I take issue with

21  that paragraph only to the extent it doesn't

22  reflect that that statement is to the best of my

23  knowledge.

24            As far as I can tell there is

25  nothing else in the affidavit of Mr. Simon with

1   which I disagree.

2           My Counsel has advised me, and I

3   agree Paragraph 9 which states "Garlock has never

4   conducted formal discovery against any of those

5   corporations represented by Mr. Hanly", et cetera,

6   that paragraph is true to the best of my

7   knowledge.

8           Q     Thank you, sir.  For the purposes of

9   clarification and for making sure that there is a

10  clear record, I'm going to walk through these

11  quickly and if they are any issues that come up

12  paragraph by paragraph, besides the one you

13  mentioned let me know.

14          Paragraph number one or one here on

15  the affidavit says that "you, Mr. Hanly, "have

16  served as chief national trial and coordinating

17  counsel in asbestos related injury and wrongful

18  death claims Federal-Mogul Corporation, Gasket

19  Holdings, Inc., Flexitallic Inc, T&N, PLC, T&N

20  Limited, Wagner Electric Corporation Ferodo

21  Corporation, and Felpro Corporation and related

22  companies since March of 1998."  You indicated

23  that with respect to Felpro that has not been

24  since March of 1998?

25          A     That's correct.

DONALD BEEZHOLD

1          Q     Other than that how long have you
2    served as counsel for Felpro or what needs to be
3    corrected about that?
4          A     I actually have not been counsel for
5    Felpro in any capacity until October the 1st 2001,
6    at which time Federal-Mogul Corporation and all of
7    its United States subsidiaries filed for Chapter
8    11 protection.
9          Q     That's the only change that you
10   would have to Paragraph 1?
11         A     The only other change is a technical
12   one, it's Ferodo America Inc. is the name of that
13   corporation, not Ferodo Corporation.
14               MS. PHIFER:   I object to the form of
15               the question.
16         Q     Paragraph 2, "Mr. Hanly has served
17   as trial counsel for T&N entities, Flexitallic
18   Inc., and Ferodo Corporation since 1981, has been
19   national trial and coordinating counsel for those
20   companies since 1985?
21         A     That's correct.
22         Q     Number 3, "No one alive has more
23   knowledge regarding the history and trial strategy
24   of asbestos injury and wrongful death cases of
25   those above-mentioned entities, than does

1    Mr. Hanly?

2          A    Regrettably I think that's true.

3          Q    Number four, "During the time in

4    which Mr. Hanly has represented T&N, T&N has

5    resolved approximately 500,000 lawsuits involving

6    claims for asbestos-related personal injury and/or

7    wrongful death.  During that period of time

8    Garlock Inc. has been a co-defendant in several

9    hundreds thousand of those lawsuits?

10         A    I believe that to be true based on

11   my experience.

12         Q    Number five, "While Mr. Hanly has

13   represented Federal-Mogul corporation

14   Federal-Mogul Corporation has resolved

15   approximately 250,000 lawsuits filed in claims or

16   asbestos-related personal injury and/or wrongful

17   death, Garlock Inc. was a co-defendant in most of

18   those claims."

19         A    I believe that to be true.

20         Q    Number six, "None of the

21   corporations that Mr. Hanly represents have ever

22   paid Garlock any money through either settlement

23   or judgment for any cross-claim, claim for

24   contribution or claim for indemnity".

25         A    To the best of my recollection and

DONALD BEEZHOLD

Page 12

```
 1    knowledge that's true.
 2              Q    Seven, "To your knowledge Garlock
 3    has never demanded any payment or affirmatively
 4    made any claim for payment as a cross-claim, claim
 5    for contribution or claim for indemnity of any of
 6    the corporations represented by Mr. Hanly".
 7              A    I believe that to be true.
 8              Q    Eight, "Garlock has does not and has
 9    historically has not filed formal or affirmative
10    pleadings seeking cross-claim, contribution or
11    indemnity from any of the corporations represented
12    by Mr. Hanly, other than those cross-claims that
13    are deemed to have been filed by Garlock's having
14    answered a plaintiff's claim, as exists in certain
15    standing orders in Texas and similar orders of
16    certain courts in some other states.
17              A    I am not aware of any such pleadings
18    have been filed.
19              Q    Nine, "Garlock has never conducted
20    formal discovery against any of those corporations
21    represented by Mr. Hanly, including but not
22    limited to never having deposed a Federal-Mogul or
23    T&N witness?
24              A    I believe that to be true.
25              Q    Ten, "Garlock has never put before a
```

1    jury a case against Federal-Mogul or T&N in any

2    case in which they remained with Garlock as trial

3    defendants".

4         A    To the best of my knowledge that's

5    true.

6         Q    Eleven, Federal-Mogul Corporation

7    and T&N and Gasket Holdings Inc. have been sued by

8    hundreds of clients represented by Water and

9    Krauss and in a professional context the interest

10   of Federal-Mogul Corporation and T&N and other

11   companies represented by Mr. Hanly are adverse to

12   those of the claimants represented by Waters and

13   Kraus."

14        A    That's true.

15        Q    Twelve, "You have not received any

16   guarantees or promises in exchange for your

17   testimony"; is that correct?

18        A    That's true.

19        Q    Number 13, "The practical effect of

20   Garlock having a cross-claim, a claim for

21   contribution or claim for indemnity in any case

22   against Federal-Mogul Corporation or T&N or any

23   related company, has been a non-event in the

24   resolution and litigation of hundreds of thousands

25   of claims over many years."

DONALD BEEZHOLD

1          A     Certainly that's true from a

2     financial or strategic perspective.

3          Q     Sir, I believe those are all the

4     questions I have, I'll pass the witness.

5               MR. LEVINTHAL:  Just so it's clear

6               to start with Mr. Reed and I are going to

7               split the questions.

8     EXAMINATION BY

9     MR. REED:

10         Q     My name is Michael Reed, I'm partner

11    with Pepper Hamilton LLP in Philadelphia.  I'm

12    special bankruptcy counsel for Garlock Inc.

13              First, I would like to have marked

14    and let's call it G1, a document and ask Mr. Hanly

15    to look at it, take a few minutes to look at it.

16                   (Informational Brief, was

17              marked as Exhibit No. G1, for

18              identification, as of this date.)

19         A     Yes, sir, I have looked at it.

20         Q     Can you identify G1?

21         A     Yes, sir, it's the Informational

22    Brief that the various Federal-Mogul debtors,

23    including T&N filed in the bankruptcy proceeding

24    commenced on October the 1st, 2001.

25         Q     Does your signature appear on G1?

```
 1          A    My signature does not appear on G1.

 2          Q    Was G1 -- does your name appear

 3   below a signature line which bares a signature by

 4   an attorney at your firm on G1?

 5          A    No, sir.  My name appears but not

 6   below a signature line for my firm or me.

 7          Q    All right, let's take another shot.

 8               Did you participate in the

 9   preparation of G1?

10          A    Yes, sir.

11          Q    Is it fair to say you are a

12   co-author of G1?

13          A    Yes, sir.

14          Q    To the best of your knowledge are

15   the contents of G1 truthful?

16          A    Yes, sir.

17          Q    Is there anything in G1 that you

18   believe to be incomplete within the confines of

19   what the subject of G1 -- strike that.

20               Why was G1 filed?

21          A    It is my understanding, and I

22   qualify this by stating that I am not a bankruptcy

23   lawyer in the sense in which that term is usually

24   employed.  It is my understanding that an

25   informational brief is often filed in a complex
```

DONALD BEEZHOLD

1    bankruptcy proceeding and I was asked to

2    participate in the creation of such a document.

3            Q    I would like to mark one other

4    document.  Let's call that G2.

5                    (Affidavit of David M. Sherbin, was

6                    marked as Exhibit No. G2, for

7                    identification, as of this date.)

8            Q    Mr. Hanly, take a look at G2 and see

9    if you can identify it.

10           A    Yes, sir.  G2 is the affidavit of

11   David M. Sherbin, vice president and deputy

12   general counsel an secretary of Federal-Mogul

13   Corporation and support of various first day

14   motions filed in the Federal-Mogul bankruptcy

15   proceeding.

16           Q    G2 is a document that really

17   addresses a panoply of subject matters, isn't that

18   true, it addresses a number of different topics?

19           A    That's true.

20           Q    Is it true that one of the topics,

21   and I can't refer you to the precise page there is

22   a part of G2 that addresses the certain historical

23   matters that are also addressed in G1 concerning

24   the history of asbestos litigation with the

25   debtor?  And take your time to find it, I can't

DONALD BEEZHOLD

1    point you to the precise page?

2              A    I'm going to have to find it.

3              Q    Let me see if I can get the precise

4    page.  I apologize for that.

5                   I would refer you to page eight,

6    Page 8 and 9, Pages 8 and 9.

7              A    Yes, sir, and your question.

8              Q    Pages 8 and 9 discuss the, well, did

9    you participate in or were you consulted in the

10   preparation the statements made on Pages 8 and 9?

11             A    I was not consulted concerning the

12   specific matters with respect to this affidavit.

13             Q    But, I would then ask you to briefly

14   read paragraphs 16, 17 and 18 on pages 8 and 9 if

15   you would.

16             A    Yes, sir, I have read those.

17             Q    Are those statements truthful to the

18   best of your knowledge?

19             A    To the best of my knowledge the

20   statements in paragraphs 16, 17 and 18 are true.

21             Q    Now, I would ask you the same

22   question about G2, do you know why it was filed?

23             A    No, not specifically, all that I,

24   all that I have been informed of it's typical and

25   supportive of folks in the bankruptcy area call

DONALD BEEZHOLD

1    first day motions to file an affidavit from an

2    officer of the corporation.

3              Q    I only have a couple of more

4    questions.

5              Do the debtors have any agreement

6    with the parties who noticed this deposition that

7    relates to your appearance here or your testimony?

8              A    No, sir.

9              Q    You have already testified that you

10   had a phone conversation with Mr. Simon concerning

11   your testimony?

12             A    Yes, sir.

13             Q    Did Mr. Simon make any suggestions

14   to you about how you should testify?

15             A    No, sir.

16                  MS. CONROY:  It wasn't a

17             conversation about his testimony.

18                  MR. REED:  I'm not trying to

19             trick anybody.  Thank you, that's all I

20             have.

21   EXAMINATION BY

22   MR. LEVINTHAL:

23             Q    My name is Bernie Leventhal not much

24   special about me.  I recognize you from courtroom

25   past as a matter of fact over the years.  I'm

```
 1    going to be very brief.
 2                 Mr. Simon's statement in paragraph 3
 3    of the affidavit that sort of sets you out as the
 4    keeper of the flame so to speak.  I would assume
 5    that you are in a position as to how the landscape
 6    has changed over the years in the asbestos
 7    litigation?
 8         A     Regrettably I am.
 9         Q     In fact, some of the companies, let
10    me ask you:  The companies that are listed in
11    paragraph one of Mr. Simon's affidavit that you
12    have represented did any of those companies used
13    to be members Center for Claims Resolution?
14         A     Yes, sir.
15         Q     Which one?
16         A     Flexitallic or Gasket Holdings,
17    which is the same company.  T&N, PLC are the same
18    company and Ferodo.
19         Q     And at some point that came out of
20    the CCR?
21         A     Yes, sir, at different points.
22         Q     And prior to being members for the
23    Center of Claims Resolution were any of them
24    members of the Wellington Facility?
25         A     Yes, sir, all three were.
```

Case 1:01-cv-00181   Document 23   Filed in TXSD on 11/14/2001   Page 148 of 156

1          Q    Would it by a fair statement that

2     their purposes, the primary purpose in belonging

3     to that consortia was really to settle claims

4     filed by plaintiffs in the asbestos litigation?

5          A    That was certainly the intention

6     those three entities.

7          Q    In fact, as a general proposition

8     over the years was that, in fact, what that more

9     often than not accomplished?

10         A    Yes.

11         Q    Perhaps less than you would like.

12              Has it been your experience

13    representing these companies that in the most

14    recent times, last two years, three years, there

15    has been an increase in claims filed, cases filed

16    against these defendants?

17         A    Yes, sir.

18         Q    Has it likewise been your experience

19    that in this period of most recent couple of years

20    when more and more defendants are going into

21    bankruptcy, demands of settlement cases have

22    increased?

23         A    Absolutely.

24         Q    Would it be fair to say that in the

25    context of any single asbestos case plaintiffs

DONALD BEEZHOLD

```
 1    were looking to your clients for larger shares so
 2    the case itself could settle for the same basic
 3    amount of money that it had always settled for?
 4                    MR. GREENSTONE:  Objection.
 5         A    Yes, sir.
 6         Q    Was it your experience that the
 7    effect on your clients was that Plaintiff's
 8    counsel were looking to your clients for larger
 9    so-called shares than they ever had been before?
10         A    I think that's the same question you
11    just asked.
12         Q    He objected to the form, I wanted to
13    rephrase it?
14         A    The answer is yes.
15         Q    Now, you have testified that with
16    respect to Paragraphs 8 and -- I'm sorry with
17    respect to Paragraphs 6 and 9 of Mr. Simon's'
18    affidavit you believe the statements to be true to
19    the best of your knowledge; isn't that correct?
20         A    Yes.
21         Q    Would you likewise say the same
22    thing with respect to Paragraphs 8 and 10 of
23    Mr. Simon's affidavit?
24         A    Yes, sir to the best of my knowledge
25    and recollection.
```

DONALD BEEZHOLD

1          Q    And that would be because you never

2    represented Garlock so you can't say with

3    certainty what Garlock always did or never did or

4    anything like that?

5          A    No, I don't think that's the reason

6    that I qualify my answer.

7          Q    What is the reason you qualify your

8    answer?

9          A    The reason I qualify my answer is

10   that, as you know, your client and mine have been

11   defendants in hundreds of thousands of cases.

12   While I have had responsibility over many years

13   for essentially all of those cases, I cannot

14   recollect having read each and every pleading as I

15   sit here today.  Therefore, it is possible that

16   there may have been from time to time affirmative

17   pleading of some sort up for another, by your

18   client asserting a cross-claim or contribution or

19   indemnity plan.  I simply cannot recall that ever

20   having occurred.

21          Q    Okay, fair enough.

22               In paragraph eight, drawing your

23   attention to Paragraph 8, that states that Garlock

24   does not and historically has not filed formal or

25   affirmative pleadings seeking cross-claim

1   contribution indemnity from any of the

2   corporations represented by Mr. Hanly.  Other than

3   those cross claims that are deemed to have been

4   filed by Garlock's having filed an answer to

5   plaintiff's claim.

6           A    Yes, sir.

7           Q    Has it been your experience over the

8   years in various jurisdiction that the asbestos

9   litigation has had its own rules as opposed to

10  other types of litigation?

11          A    I certainly agree with that.

12          Q    I ask the record to reflect the ear

13  to ear grin on Mr. Hanly's face.

14               And has it likewise been your

15  experience in jurisdictions that "deem automatic

16  cross-claims" that there is no need or requirement

17  to file any formal pleading in addition to that to

18  preserve cross-claims of defendants?

19          A    I understand that to be a case in a

20  number of jurisdictions, yes, sir.

21          Q    And finally one last thing I guess

22  that reflects the change in landscape is that your

23  clients have never been in bankruptcy before, have

24  they?

25          A    That's true.

DONALD BEEZHOLD

1           MR. LEVINTHAL:  That's all I have.

2           MR. GREENSTONE:  Nothing further.

3

4      (The deposition concluded at 1:35 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 1:01-cv-00181   Document 23   Filed in TXSD on 11/14/2001   Page 153 of 156

DONALD BEEZHOLD

|  | CHANGES AND SIGNATURE | |
|---|---|---|
| PAGE/LINE | CHANGE | REASON |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DONALD BEEZHOLD

Page 26

1              I, PAUL J. HANLY, JR., have read
   the foregoing deposition and hereby affix my
2   signature that same is true and correct, except as
   noted above.
3

4

5

   _____
6                    PAUL J. HANLY, JR.
7   THE STATE OF_____)
   COUNTY OF_____)
8         Before me,_____, on this
   day personally appeared PAUL J. HANLY, JR., know
9   to me (or proved to me under oath or through
   _____ (description of identity card or
10  other document) to be the person whose name is
   subscribed to the foregoing instrument and
11  acknowledged to me that they executed the same for
   the purposes and consideration therein expressed.
12         Given under my hand and seal of office
   this_____day of_____,2001
13

14

15

   _____
16  NOTARY PUBLIC IN AND FOR
   THE STATE OF_____
17

18

19

20

21

22

23

24

25

DONALD BEEZHOLD

```
 1              REPORTER'S CERTIFICATION
             DEPOSITION OF PAUL J. HANLY, JR.
 2                  NOVEMBER 11, 2001
 3              I, DANIELLE GRANT, Shorthand Reporter in
     and for the State of New York, hereby certify to
 4   the following:
             That the witness, PAUL J. HANLY, JR., was
 5   duly sworn by the officer and that the transcript
     of the oral deposition is a true record of the
 6   testimony given by the witness;
 7           That the deposition transcript was
     submitted on NOVEMBER 2, 2001, to the witness or
 8   to the attorney for the witness for examination,
     signature, and return to me.
 9
             That the amount of time used by each
10   party at the deposition is as follows:
11           MR. GREENSTONE - -18 Minutes
             MR. REED - -       9 Minutes
12           MR. LEVINTHAL - -  3 Minutes
13
14
15
16
17
18
19
20
21
22
23
24
25
```

DONALD BEEZHOLD

1        That pursuant to information given to the
deposition officer at the time said testimony was
2  taken, the following includes counsel for all
parties of record:

3

4     DAVID GREENSTONE, Attorney For Plaintiffs
     ROBERT BROOKS-RIGOLOSI, Attorney for Defendant
5     CHRISTOPHER P. DePHILLIPS, Attorney for
Defendants
6     BERNARD L. LEVINTHAL, Attorney for Defendants
     MICHAEL H. REED, Attorney for Defendants
7     ELIZABETH L. PHIFER, Attorney for Defendant
     COLIN M. CHERICO, Attorney for Defendant
8     JOHN CESARO, Attorney for Defendants
     JAYNE CONROY, Attorney for Witness

9

        I further certify that I am neither
10  counsel for, related to, nor employed by any of
the parties or attorneys in the action in which
11  this proceeding was taken, and further that I am
not financially or otherwise interested in the
12  outcome of the action.
        Further certification requirements
13  pursuant to Rule 203 of TRCP will be certified to
after they have occured.

14

        Certified to by me this 2nd of November,
15  2001.

16

17

18

                 _____
19               DANIELLE GRANT,
                NOTARY PUBLIC IN AND FOR
20               THE STATE OF NEW YORK

21

22

23

24

25